[Crim. No. 6273. In Bank. Feb. 17, 1959.]

THE PEOPLE, Respondent, v. RAYMOND L. CARTIER, Appellant.

Robert K. Barber, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, Norman H. Sokolow, Deputy Attorney General, James Don Keller, District Attorney (San Diego), and F. E. Gallagher, Deputy District Attorney, for Respondent.

McCOMB, J.—This is an automatic appeal from a judgment of guilty of murder in the first degree after trial before a jury. The jury fixed the punishment at death and found

defendant to have been sane on the date of the commission of the offense.

Viewed in the light most favorable to the People, the record discloses the following facts:

In November 1957 defendant, 29 years of age, resided with his wife, Geneva Cartier, in a single-story duplex dwelling in San Diego. Defendant and his wife had been married a few months before.

On November 11, 1957, defendant left work at approximately 3:45 p. m. and by prearrangement met his wife. They went to a bar, had a drink and made plans for Mrs. Cartier to leave her job about 7 o'clock that evening. Mrs. Cartier was then driven to her place of employment, and defendant drove home, where he changed his clothes and cut a rug in half, as requested by his wife. While at home, defendant drank one "mixed drink" and half of a second. When he had drunk about half of the second one, he added some wine to it. This drink he also consumed.

About 5:30 defendant left home and drove to a bar, where he had a few beers. At approximately 7 p. m. he met his wife at her place of employment. They immediately went to a nearby bar for a drink, but before doing so each of them drank from a bottle which defendant had brought with him. After having one drink at the bar, they left and proceeded to another bar. Between the two bars they drank the rest of the contents of the bottle which defendant had. At this time defendant felt exceedingly happy and gave his wife the keys to their automobile. At the second bar they had two drinks, played shuffleboard, and left about 8:15 to go to another bar, the Java Club.

They arrived at the Java Club between 9 and 10 p. m. They took seats at the end of the bar and invited a waitress to have a drink with them. She accepted the offer and sat with them at the bar for approximately 45 minutes. Defendant left his wife and the waitress and went to the rest room. During his absence a sailor came into the bar with a ring which he was trying to pledge. The waitress and defendant's wife called the sailor over to show them the ring, struck a match to see it better, and in the process held the sailor's hand. Defendant was standing behind his wife while she and the waitress were looking at the ring on the sailor's finger, and defendant became very angry and violent because they were talking with the sailor. He told the sailor that if he did not take his hands off his (defendant's) wife, he would "knock

his block off.'' Defendant's wife then tried to humor defendant back into a happy state. Thereafter defendant got into an argument with the bartender about the latter's refusal to cash a check for him. He then went to the rest room again, and upon his return suggested that he and his wife go home, and the two walked out of the bar with their arms around each other.

Mr. Martinez, who lived with his wife and child in the other dwelling unit in the duplex occupied by the Cartiers, stated that on the evening in question he had gone to bed about 7 or 7:30 and was later awakened by the sound of violent quarreling coming from the Cartier residence. The quarreling lasted for about 15 minutes, during which time he heard a ''scuffling'' noise ''like furniture being moved,'' and then he heard defendant's wife say, ''Please, please, don't!'' Thereafter he heard three or four thuds on the wall or floor, after which everything became silent and he went back to sleep.

Mr. Martinez was awakened later by a neighbor's calling ''Fire!'' Thereupon he arose, dressed, and went outside to the front of the Cartiers' part of the duplex. There he saw defendant standing on his front porch with the front door closed behind him. Defendant was facing away from the front door and was motionless. Mr. Martinez asked defendant if Mrs. Cartier was inside, and defendant replied: ''I think so. I don't know.'' Mr. Martinez then tried to open the front door. Finding it locked, he forced it open by kicking it. He then entered the house and found it filled with smoke and the heat quite intense. He then came out of the house and walked around to the back porch of the house, but found too much smoke there to enter. He returned to the front of the house and stood with defendant beside a car. Defendant suddenly ran into the Martinez side of the duplex. Mr. Martinez followed him and found defendant in the kitchen trying to knock down the kitchen wall with a chair. The kitchen wall was opposite the bedroom in the Cartier side of the duplex. When asked what he was doing, defendant replied that his wife was in there and that he loved her.

It was about 11:30 p. m. when the neighbor had noticed the fire. Shortly thereafter members of the fire department arrived and extinguished the fire, and the body of defendant's wife was found on the floor of the bedroom. It was lying face upward, with the head near the foot of the bed, and was covered with considerable debris, which appeared to have been bedclothes and a foam rubber mattress. Also discovered near

the body were a butcher knife, a French chef's knife, and several pieces of heavy glass similar to a heavy glass ashtray. In a corner of the bedroom was found a meat cleaver. A paring knife was found on the floor beneath the shoulders of the body.

An autopsy disclosed that the body was charred over nearly the entire skin surface. Both bones of the lower right arm were fractured at a point approximately one inch below the wrist joint, and the bone fragments protruded through the flesh. A large wound extended from the collarbone on the left downward and across the midline to and including the vagina. The wound was jagged and extended through the skin, underlying fat and muscle tissue. The cartilages of the second through the tenth ribs on the left side had been separated, and the heart had been severed from the major vessels connecting to it and removed from the body. The vagina had likewise been cut out from the surrounding tissue. On the head there was a depressed fracture, oval in shape, approximately one and a half centimeters in diameter, at a point a little above the ear. An examination of the tracheobronchial tree revealed no evidence of smoke inhalation. In the opinion of the autopsy surgeon, the death of defendant's wife was caused by the cutting out of her heart.

Two experts testified that they had inspected the Cartier home after the fire, that the area of greatest burning was located in the bedroom at a point near the foot of the bed, where the body was found, and that the fire started at that point near the floor below the level of the bottom of the bed. They further testified that the fire was of deliberate incendiary origin.

These are the questions necessary for us to determine:

First. *Did the trial court err in refusing to permit defendant to hear recordings of his conversations with the police officers subsequent to his arrest, which conversations he claimed he did not remember?*

*Yes.* ▮ In a criminal case an accused is entitled to hear recordings of his conversations with police officers where he has forgotten what he said at the time he was examined and alleges that the recordings are necessary to refresh his recollection. (*Vance* v. *Superior Court, ante,* pp. 92, 93 [1] [330 P.2d 773]; *Powell* v. *Superior Court,* 48 Cal.2d 704, 705 et seq. [312 P.2d 698]; *People* v. *Riser,* 47 Cal.2d 566, 587 [29] [305 P.2d 1].)

▮ In the present case, after defendant was arrested by

the San Diego police, he was interrogated by Sergeant DeVore and various other public officials in a room in the jail. The conversations were recorded by means of a hidden microphone and lasted for a period of an hour and 45 minutes. Later the same day, November 12, 1957, defendant was further interrogated by Sergeant DeVore and other police officers. This later conversation was recorded in the same manner as the first conversation and lasted for about 20 minutes. Defendant was also interrogated by Dr. Meyers on the same day.

During the trial defendant moved for an order to permit him to inspect the transcriptions of these conversations. After a considerable colloquy the trial judge granted the prosecution 48 hours in which to prepare counteraffidavits and announced that before ruling on the motion he would require that defendant waive his constitutional right not to testify and also require that defendant be examined under oath outside the presence of the jury on the validity of the allegation in his affidavit that he was unable to recall the contents of the various recorded conversations.*

---

*The following proceedings were had at the bench out of the presence of the jury:

''Mr. Gallagher [for the prosecution]: The thought came to me that in view of counsel's motion which is pending for the production of transcripts that I might inform the court at this time I do have transcripts of three tape recordings; one is an interview conducted on November 12th at approximately 3:10 a.m.; another one an interview on the 12th during the afternoon hours; and the third is an interview on the 12th in the afternoon conducted by Doctor Meyers. The first two interviews were conducted by the present witness, Sergeant DeVore. I have those transcripts here and I would suggest, or perhaps offer, if the Court deems it advisable, that I put these transcripts in the possession of the Court at this time, since it is a matter of the sound discretion of the Court to ascertain if the witness needs to refresh his recollection from the transcripts passing on the motion. So I would give these three transcripts, or make them available to the Court now, should the Court desire in any way to refer to them or to examine them and consider them in the light of the present testimony which is going to be admissions made by the defendant during the initial interview at 2:10—or 3:10 a.m. on the 12th. If the Court would feel that to be a proper thing to do at this time.

''The Court: Is that the Riser Case?

''Mr. Gallagher: I think the Riser case would have a bearing on it, but as I recall on that case there are certain words in that case which might have a bearing on this situation and I think to keep the Court fully advised, and in view of that case to be able to exercise sound discretion in this matter.

''The Court: I tell you, you can leave them up here and we will not mark them for identification. If I think counsel should have them, if there is anything in there that would be beneficial to him, I will consider turning them over. If there is nothing in there I will have them marked for identification at the conclusion of the trial so that the upper court,

Defendant filed a written motion for the inspection of the foregoing recordings, together with affidavits of himself and his counsel. Defendant's affidavit alleged that he had been interrogated by police officers and by Dr. Meyers at various times on November 12, 1957; that he believed certain of those conversations had been recorded and transcribed; that one of the conversations lasted in excess of 45 minutes; that each

if it should be necessary to take it up there, may see what is in those transcripts and those recordings as to whether or not there has been an abuse of discretion.

"Mr. Gallagher: I think that is perfectly agreeable with me. My only purpose is to make sure that this trial is conducted fairly and that the defense has all they are entitled to and do everything possible to make things available, and that a proper showing be made by the defendant under the case.

"The Court: I have seen so many of these recordings and the officers usually follow questions and answers given practically word for word, but in the transcriptions and in the recordings there is usually some prior record of the defendant that is brought out which they eliminate and which, of course, doesn't get before the jury, if a copy of the transcription is given to defense counsel, but so many times these defendants sit down there and make voluntary statements which are self-serving declarations, and defense counsel says, 'Well, now, officer, didn't he also tell you so and so; didn't he tell you so and so?' And by just asking the question they get the whole thing in the record. You have got to permit the person to ask the question, these self-serving declarations and these other things that creep in there, 'Weren't you arrested once for that?', and that should be kept out. If the officer gives an accurate recitation of the questions and answers that are pertinent I don't see why it is necessary for the defendant to have the transcripts turned over to him, or the recording. That is my view of it.

"Mr. Gallagher: I might add in this case, too, in line with your Honor's words, that there are things in the transcript which relate and are prejudicial to the defendant.

"The Court: In this one?

"Mr. Gallagher: Yes. His conduct in being AWOL from the Navy and such things as that, and I have instructed the officer in the interests of fairness that certain matters which I considered would be prejudicial which are not factual and related to this case, that he not relate and volunteer, so that the jury would not be prejudiced by anything the defendant said which is on the basis of speculation or admissions against his interest, but which do not—are not probative of the issues involved here. I am asking the officer to relate admissions made which are factual, based upon the defendant's movements, the factual things pertaining to issues that are properly before the jury.

"The Court: I think if I marked them for identification at this time— I don't know—I looked it up once before, I think if I marked them for identification, I think all counsel in the case, when you mark something for identification, are entitled to see it. So instead of marking them for identification, if you will leave them with me I will have them marked for identification at the conclusion of the trial. What is your idea, Mr. Fulkerson?

"Mr. Fulkerson [for the defense]: At this time my idea is this, that a witness's verbal recitation is subject, of course, first to the instruction that his oral admissions or confessions are to be viewed with caution; secondly, although to this date no court has held that accurate reproduc-

of the others lasted in excess of one hour; that he was unable to recall or relate to his attorney the things contained in the statements; that such recordings were necessary to refresh his recollection; and that no copies had been furnished to him.

The affidavit of defendant's counsel alleged that he had reason to believe that the prosecution would ''use these conversations at the forthcoming trial'' and that ''the statements, conversations and documents are necessary to the defense of

tions of the exact conversation are the best evidence, if those are available they should be introduced in place of secondary evidence.

''The Court: What do you mean, you want to introduce the recording?

''Mr. Fulkerson: I feel this way, that for proper cross-examination of this witness the exact phraseology which was used in these conversations, if available, is extremely important in order that the correct light, not a witness's interpretation of a conversation, be made, and for that purpose I feel it is an added reason why the defendant should have this recorded memory, if we may call it such, available to him, not only to assist him in putting forth his defense, but to assist in correctly presenting to the jury exactly the facts as they occurred during this conversation. In other words, science has reached the point now that although the Court has not said it is the best evidence the Court at this time should say that the recording is the best evidence because it can accurately represent the entire conversation. Now if there are portions of the conversation which would be objectionable here for the People or for the defendant, we cannot violate the basic hearsay rule——

''The Court: I don't know. The Courts now are violating everything. They go into legislative session, they create things there is no authority for, and so forth. In this Powell case that came down, I forget, I think Justice Schauer wrote the opinion, and he said—and he had dissented in the other case, a civil suit, in which the statute authorized the inspection, but in this criminal case it said at the common law the defendant wasn't entitled to a copy of the statement, and so forth, if he didn't sign it, and there is no provision for it in the statute, but we are going to give it to him. If I read those cases, the Riser case and the Powell case, that last criminal case that came down that Schauer wrote, I think it is a matter of discretion and I am going to exercise my discretion in this thing when I see the transcription.

''Mr. Fulkerson: For purposes of the record at this time might I object to an oral recitation of this witness's recollection of the conversation based on the fact that it isn't the best evidence of the conversation?

''The Court: Well, that is a novel theory.

''Mr. Fulkerson: I think some day we are going to have it.

''The Court: From time immemorial they have sat here and recited that thing, even when they had recordings and shorthand notes, and so forth. If it is going to be the best evidence and you are going to take that thing literally, to get the full effect and significance of everything, according to your theory, you would have to bring the whole transcription, objectionable or not, in order to get the significance, the sequence and the full effect of it. I am sure you wouldn't want to stipulate to anything like that. So I will receive these at this time and if I think you are entitled to see them when I exercise my discretion I will let you have them during the trial, and if I don't think so I will mark them for identification at the conclusion of the trial and if the Supreme Court or Appellate Court wants to see what is in them they can order them sent up to them.''

Raymond Cartier; i.e., to refresh his recollection of prior recorded conversation.''

After considering the counteraffidavits filed by the prosecution, the trial court denied defendant's motion.

In view of the rule set forth above, the trial court erred in its ruling. That this ruling was prejudicial to defendant appears from the fact that the transcription contained impeachment of the testimony of Sergeant DeVore, one of the principal prosecuting witnesses, on an important phase of the case. He testified on direct examination, and reaffirmed on cross-examination, that during his interview with defendant the latter, in response to a direct question as to who drove home, stated, ''My wife drove home.'' This testimony was valuable to the prosecution and had the effect of establishing the prosecution's theory that defendant's lack of memory of any events from the time he was at the Java Club until he was taken into custody was a mere convenience or fabrication and that it had been contradicted by defendant himself. A reading of the transcript of Sergeant DeVore's two interviews with defendant, however, reveals that Sergeant DeVore's testimony was inaccurate in this respect. The following colloquy took place between them: ''Q. Do you recall going home at all? A. No. Q. Do you recall your wife driving home? A. No.''

Previously, defendant had told the interrogator that he had given his car keys to his wife earlier in the evening because she wanted to drive. In the recorded conversations it appears that Sergeant DeVore asked defendant a couple of questions which assumed that defendant's wife had driven home, but defendant's responses did not show any recollection by him that he remembered his wife's having driven home.

In the second recorded interview defendant was asked who drove home, but his response contained no remembrance on his part.

The recorded interviews contained other evidence that would have been of material benefit to defendant and his counsel in preparation of his defense. It showed a lack of consciousness of guilt on the part of defendant, which fact would have been material to the jury in determining the weight to be given Sergeant DeVore's testimony. It appears that although the interviews took place only a couple of hours after defendant's arrest, defendant had been sleeping in his cell until called to the interrogation room; and that up to that point in the interrogation defendant had not been too alert

and bright. It also appears that when the interrogator asked defendant if he would then like to see his wife, defendant answered, "Yes."

The facts that defendant was asleep in his cell and desired to see his wife are inconsistent with a consciousness of guilt on the part of defendant for the mutilated condition of the victim and would tend to substantiate his defense of a "black-out" or intoxication sufficient to render him incapable of forming the intent necessary to constitute premeditation. These matters were known to the prosecution and the trial judge but were not known to defendant or his counsel. Obviously, under these circumstances the error was prejudicial, and defendant was improperly deprived of his right to inspect relevant and material evidence in the hands of the prosecution.

■ Second. *Did the trial court err in not marking for identification during the trial the transcripts of the recordings which defendant sought to have introduced into evidence?*

*Yes.* At the time the trial court denied the motion to inspect the transcripts of the recordings, he had before him the affidavits and counteraffidavits and the testimony of Sergeant DeVore. He had also been provided by the prosecution with transcripts of the recorded conversations. These transcripts were not made available to defendant and for that reason were physically received by the judge with the announcement that he would not mark them for identification until the case was closed, because otherwise defendant would have a right to see them.

This procedure was novel. It permitted the trial judge to pass upon defendant's motion on the basis of evidence and documents not available to defendant or his counsel and had the effect of substituting the judge for defendant's counsel, insofar as defendant was to be represented by counsel, in arguing the admissibility or effect of the documents with respect to his motion.

They were before the judge as a basis for the judge's rulings but were never available to defendant.

Such a procedure was violative of defendant's right to due process of law. It permitted the judge to base his ruling upon evidence prepared by the prosecution, but denied to defendant and his counsel the right to inspect and know what such evidence was.

It is evident that in passing upon defendant's motion to inspect the transcriptions of the recordings the trial court was called upon to determine issues of fact or mixed issues of fact

and law, that is, that the recordings contained no matters of impeachment, nothing that would assist the jury in the ascertainment of the true facts with fairness to defendant and the People alike, and nothing that would assist defendant in refreshing his memory as to what had been said.

It is a denial of due process of law and fundamental fairness for a court to determine such issues upon the basis of evidence available to it and the prosecution but not also available to the defendant and his counsel. It is analogous to denying to the accused his right to cross-examine or confront witnesses produced against him. In fact, it is more akin to a procedure whereby a defendant and his counsel would be prevented from even seeing the witnesses or hearing their testimony or examining physical evidence.

The procedure here adopted denied to defendant the following rights guaranteed by the due process clauses of the federal and state Constitutions: (1) The right to confront adverse witnesses, (2) the right to be present at all stages of the proceedings, (3) the right to be represented by effective counsel, (4) the right to cross-examine, and (5) the right to be heard on the meaning of the evidence and the inferences to be drawn therefrom. (See U.S. Const., Amend. XIV; Cal. Const., art. I, § 13.)

The procedure followed in the instant case constituted a departure from recognized rules and procedure designed to insure the accused a fair trial. The error obviously was prejudicial and could have resulted in a miscarriage of justice.

■ Third. *Did the trial court err in sustaining an objection to defendant's offer of proof with respect to Dr. Lindemulder's opinion as to defendant's sanity at the time of the commission of the alleged crime, which examination was made while defendant was under the influence of sodium pentathol?*

*Yes.* Defendant offered to prove that Dr. Lindemulder would testify that he first examined defendant at the San Diego jail and formed the opinion, based upon this physical examination, that defendant was sane and that if defendant "blacked out" prior to the time of the alleged crime the blackout was probably caused from excessive use of alcohol; that he examined defendant a second time pursuant to court permission at a clinic in San Diego, on which occasion he placed defendant under the influence of sodium pentathol; that after defendant was placed under the influence of this drug the doctor held a conversation with him concerning events which occurred on November 11, 1957; that based on

this conversation it was the doctor's opinion that defendant was insane on November 11, 1957, and was incapable of appreciating the nature and quality of his acts at that time; that the use of sodium pentathol is an accepted medical procedure; that in the doctor's opinion the examination under consideration was a successful one; and that the doctor would identify a tape recording as being that of the conversation in question, would lay the foundation of the recording as the basis for his opinion, and would further qualify it in regard to authenticity for presentation before the jury.

The trial judge sustained the district attorney's objection to the offer of proof, stating that if the doctor was called he could not use the information obtained from defendant under truth serum as a basis for forming his opinion.

In *People* v. *Jones*, 42 Cal.2d 219, 225 [12] et seq. [266 P.2d 38], this court held that although it is questionable whether results of an examination made while a person is subject to "truth drugs" are admissible in evidence if the statements are offered for the purpose of proving the truth of the matter asserted, the use of such drugs does not preclude a psychiatrist from giving his expert analysis of defendant's answers to questions while under the influence of drugs for the purpose of determining whether, in the opinion of the psychiatrist, defendant was sane or insane at the time of the commission of the alleged offenses. (See *People* v. *Jones, supra,* pp. 222, 225 [11] et seq.) It is, of course, a question for the trier of fact to determine from all the evidence, including the testimony of the doctor, whether defendant was sane or insane during the period in question.

In the present case the testimony offered was the expert opinion of the psychiatrist that defendant was insane at the time of the commission of the alleged offense. The statements made to the psychiatrist by defendant while under the influence of the drug were not offered for the purpose of proving the truth of the matter asserted therein. Hence, under the foregoing rule, it was error for the trial judge to exclude the proffered evidence.

In view of our conclusions, it is unnecessary to discuss other errors urged by defendant.

The judgment is reversed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.