[Crim. No. 2997. Third Dist. May 13, 1960.]

THE PEOPLE, Respondent, v. CHARLES C. R.
KENNEDY, JR., Appellant.

Bowers & Sinclair and F. L. Sinclair for Appellant.

Stanley Mosk, Attorney General, Doris H. Maier and Raymond M. Momboisse, Deputy Attorneys General, for Respondent.

VAN DYKE, P. J.—This is an appeal from a judgment based upon verdicts of a jury finding appellant guilty on Counts I and III of grand theft, and from the order denying his motion for a new trial. Count II was dismissed before the trial.

The information charged in Count I that on or about September 15, 1958, in Nevada County, appellant unlawfully took the property of William D. and Anna E. Chambers "consisting of a promissory note in the sum of $3,600.00" of a value in excess of $200. In Count III it was charged that he had on or about October 15, 1958, unlawfully taken from the Chambers $300 in money.

Mr. and Mrs. Chambers were the owners and operators of a restaurant and bar known as "The Gold Nugget Inn" located halfway between Nevada City and Grass Valley in Nevada County. In the fall of 1957 the business was in financial difficulty. Mr. Chambers told appellant, who was a customer of the restaurant, about his business difficulties and appellant offered to assist him by acting as his financial adviser. This he did until late in 1958. Shortly after his services were ended the information was filed against him. His services were admittedly extensive. He first obtained a financial statement of the condition of the business, found that considerable money was owed on past due bills, and successfully negotiated with the creditors to accept trade acceptances, thus deferring payments and putting the past due debts on an installment payment basis. He initiated the hiring of a bookkeeper, set up a system of daily audits of receipts and expenditures with frequent bank deposits and the payment of most bills therefrom. Later he obtained a discharge of the bookkeeper so employed and placed the record-keeping in the hands of a certified public accountant. He attempted to secure a more liberal lease for a longer time, but failed. He obtained a reduction of payments to be made to the bank for bank loans. He devoted a great deal of time to the service of the business. He was never paid, and there was admittedly no express agreement that he should be. There was much testimony, including his own, that at least initially, he was serving free of charge. There was other testimony that the demands of the business on his time exceeded that which he had expected would be required and that he suggested payment at some future time if the business prospered. This never happened. From the beginning of his services to the end the business was insolvent in that it could not pay its obligations as they matured.

On September 15, 1958, he obtained from the Chambers their promissory note for $3,600, payable in monthly installments of $300. It was the prosecution's theory that he did this by fraudulently representing to the Chambers that he had, by depositing his own funds in the business bank account from time to time, advanced or loaned $3,600. It is not disputed that appellant had made deposits of his own funds in the business account with consent of the Chambers and upon his explanation to them that he was in litigation difficulties and desired to use their account as a convenience in conducting his own affairs. He also made withdrawals from time to time for his own use. Mrs. Chambers testified that he told her his deposits had amounted to around $3,600 more than withdrawals; that he wanted some proof or record of the indebtedness to him; and that in substantiation of his statement he showed her a number of bank deposit slips. She said she remembered specifically one deposit slip for $2,000 which bore the bank teller's stamp. In fact, no such deposit had been made. After the conversation with Mrs. Chambers the three got together. Appellant had prepared the note he wanted signed. The Chambers both testified that Mr. Chambers questioned that the business owed appellant so much, and that appellant referred him to Mrs. Chambers who said she had seen the deposit slips and thought the amount was about right. Chambers testified he had said it seemed to him a futile thing for them to give appellant a note when they all knew it could not be paid even at the rate of $300 per month as the note provided. It is conceded that the three understood that, although the note should be delivered, the Chambers would not have to pay the note nor make the monthly payments of $300 until the business "got on its feet," and not even then unless, having achieved the ability to pay, the Chambers should feel that they ought to pay. None of these matters appeared on the face of the note. Appellant testified that he told the Chambers he wanted the note, not as expressing an obligation to repay advances, but as a record of the amount of time he had put in for which he had not been paid, so that if the business went into bankruptcy he could then file a claim against the assets. He said further he told them that if he recovered anything and they needed the money he would give it to them. Mrs. Chambers testified that she understood the note was "just a token or record that Mr. Kennedy was to keep," and Mr. Chambers did not specifically deny this.

The prosecution introduced evidence to show that appellant attempted to negotiate the note. This was, of course, relevant on the subject of his intent to defraud by obtaining the note through false representations, by showing conduct on his part violative of the allegedly false representations he made as to the measure and extent of their obligations to repay advances, and violative also of his implied agreement not to negotiate the note. The evidence, briefly stated, was that he had dealt with one Mary Mollineaux to obtain $3,100 from her by selling the note to her; that the transaction had gone to the point of her borrowing that amount of money on her own securities and endorsing the bank draft which the loan produced over to appellant. It also appeared that at that point the negotiations broke down; that Mrs. Mollineaux returned the note to appellant (he had endorsed it in blank), and received back at least part of the money out of her loan from the bank. Appellant came away with the note, with the endorsement scratched out. Appellant's testimony concerning this transaction gave it an innocent look instead of the guilty complexion which the prosecution sought to infer. He said Mr. Chambers was in difficulty concerning money given him by a coadventurer for the purpose of purchasing land, which money he had embezzled; that he was under pressure for this; that the amount was $4,100. In addition, he and his coadventurer had, without paying for the property, cut $2,200 worth of timber off the land, divided the money, and Mr. Chambers had spent his half. Appellant testified he was attempting to get from Mrs. Mollineaux money enough to extricate Mr. Chambers from this difficulty and that was the reason he had been dealing with Mrs. Mollineaux.

When the first $300 payment became due on the note appellant, who often received from the accountant blank checks for use in the business, which he then had signed by Mr. Chambers, so used one of these checks to withdraw $300 from the business bank account. This forms the basis for the second count of grand theft. Appellant testified that he did this because he thought that under the arrangements he was entitled to withdraw the money. It is undisputed that he deposited $300 in another account in a different bank to the credit of Mrs. Chambers.

On the 24th of October, 1958, five or six weeks after having obtained the note, and several weeks after the Mollineaux transaction and before any difficulties had arisen between the parties, appellant placed the note in an envelope, sealed it and

wrote across the face of the sealed envelope the following words:

"October 24, 1958

"Mr. Jack Truscott

Grass Valley, California

"Dear Jack—Here is a promissory note given to me by Bill Chambers and his wife for $3,600.00—which I will have to return to him as null & void unless I should charge for my services for which I have never been paid. If he, Chambers, should go broke, I may file a claim for services and any money received loan it back to him to help them out. If not, I'll return the note to them. The $300.00 payment received I'll put in Chambers account in Sacramento first as if Ann Chambers had gotten it herself. I am also guarantor for Palace Meat Account. Keep all of this for me in safe keeping until I call for it—or tell you to return it to Chambers—in which event be sure & mark note void. Thanks Jack.

Chas. C. R. Kennedy, Jr."

He then placed the envelope in the custody of Mr. Truscott. Appellant never again had the note in his possession.

At various times during the trial, both during the introduction of the prosecution evidence and during the introduction of the defense evidence, and on varying grounds, appellant sought to have this envelope with the writing on its face introduced into evidence, and in every case the offer was refused. He was allowed to go no further than to say he had sealed the note in an envelope and handed it to Truscott. It was shown by the testimony of Truscott that on the date appearing on the envelope that document had been brought to him by appellant with the request that he keep it; that he then put the envelope unopened in his office safe, where it remained until the first trial of this action, during which he produced it in court and testified as to his custody of it. The envelope was at the first trial opened before the court, and the note was found inside. The note was then introduced in evidence, as was also the envelope with the writing on its face. In the first trial the jury disagreed and the judgment here appealed from was obtained at the second trial when, as stated, the envelope, although admitted to show the date only, was otherwise rejected.

The refusal of the court to admit the written and oral testimony of the instructions given Truscott was error. Under the admitted understandings of the parties as to the

obligations between them emanating from the note, the conduct of appellant with respect to his custody and handling of the note was material on the issues of intent to defraud and of the falsity of representations made, if any, by which appellant obtained the note. This, as we have seen, was recognized by the prosecution in its introduction of the testimony of Mrs. Mollineaux, and of others not herein related, concerning what appellant had done with the note while he had it in his possession. The prosecution properly did this to convince the jury, if it could, that appellant had obtained the note by false representations as to the consideration and upon false promises as to the intended use of it by appellant. It was equally material and relevant to permit appellant to show what his conduct had been. The conceded understandings alone were enough to place upon appellant a duty in the nature of a trust to so handle the note that it could not be presented and enforced against the Chambers as their legal obligation. It was of the utmost importance to appellant to prove in any way he could that he had made no improper use of the note, and had used due care in his custody of it. Appellant testified that when he delivered the note to Truscott he was being prosecuted by the district attorney of Nevada County of having falsely registered as a voter (he had been convicted in his early life of felonies) ; also that he was at the time in litigation with his wife over the custody of their child and her claims for child support and that she was actively represented by the Nevada County district attorney who was simultaneously prosecuting him under the criminal charge ; that he feared if the note was seized while in his possession it might be used to harass the Chambers. These things he was entitled to prove. He was further entitled to testify as to the fact and nature of Truscott's custody and to have the writing on the envelope received in evidence to further characterize the act of delivering the envelope to Truscott. These written utterances made by him were a part of the act itself. ██ Wigmore, in discussing exceptions to the hearsay rule (third ed., vol. 6, pp. 190-192) states:

"These considerations point out the four simple limitations which attend this use of utterances as verbal acts; namely:

"(1) The conduct to be characterized by the words must be *independently material to the issue*; [that is so here]

"(2) The conduct must be *equivocal*; [that is so here]

"(3) The words must aid in *giving legal significance to the conduct*; [that is so here]

"(4) The words must *accompany the conduct*. [that limitation is met here]"

 That the evidence offered was not part of the "res gestae" and was self-serving was matter going only to the weight of it and for jury consideration. We cite on this subject *United States* v. *Matot*, 146 F.2d 197, and quote therefrom the following comments appearing on page 198:

"The prosecution seeks to defend the exclusion on the theory that the testimony would have been 'self-serving,' and that it was not part of the 'res gestae.' What else but 'self-serving' the testimony of an accused person on his direct examination is likely to be, we find it difficult to understand; and as for 'res gestae,' it is a phrase which has been accountable for so much confusion that it had best be denied any place whatever in legal terminology; if it means anything but an unwillingness to think at all, what it covers cannot be put in less intelligible terms. Although Matot's testimony was the only direct evidence upon his intent, it was not fair to confine him to a bare denial—never impressive in the mouth of the accused. He was entitled to corroborate that denial by any conduct which confirmed it. Had he called the president, the question would have been the same; yet it is hard to believe that anyone would maintain that there was so little probative connection between the offer and his original purpose, that no jury could infer the second from the first. The exclusion of evidence, which does not too much entangle the issues and confuse the jury, merely because of its logical remoteness from the issue, is always a hazard, and is usually undesirable. It is always hard to say what reasonable people may deem logically material, and all doubts should be resolved in favor of admission, unless some definite rule, like that against hearsay, makes that impossible. While in a clearer case we might disregard the error, it seems to us, so doubtful are we of the accused's guilt, that Matot should have been allowed whatever advantage the testimony might have given him."

 Shortly before the note was given, that is on August 26, 1958, Mr. Chambers wrote a letter to Sinclair and Bowers, the attorneys appearing for appellant in his litigation difficulties hereinbefore related. The letter read:

"Mr. Charles Kennedy has asked us to guarantee his $1000.00 note made payable to your firm for attorney fees.

"We are indebted to Mr. Kennedy for his help to us during the past ten months and we are glad to guarantee his personal

note to you in the amount of $1000.00. Starting September 20th, we will forward our check in the amount of $100.00 per month to apply on this note. Mr. Kennedy will, we are sure, also pay on it as he can. Therefore, we ask that you let us know the balance due from time to time.

"Mr. Kennedy is a fine man, has done much for this community and it is a shame that he should be placed in the position he has been placed in to satisfy the desires of a woman who has shown little concern for the welfare of her child. We hope you win your case for Mr. Kennedy.

Very sincerely,<br>
GOLD NUGGET INN

[Signed] Wilbur D. Chambers<br>
 W. D. Chambers "

Several payments were shown to have been made by the Chambers. The theory of the prosecution was that appellant had "stolen" the note by means of falsely representing to the Chambers they owed him money for advances. It was appellant's contention that the consideration was a debt for services. This letter was relevant rebuttal of testimony by the Chambers that the note was based on money advanced and not on services rendered. It was error to exclude it.

■ Assignments of error include charges of misconduct by the prosecuting attorney and the trial judge. The trial judge is accused of having throughout almost the whole of the trial indicated bias against appellant. We have closely examined the record and we think the charge is groundless; that, on the contrary, the trial judge was zealous in his efforts to accord appellant a fair trial. There was one incident which occurred that is made the special target of attack. Appellant was under cross-examination and had adopted an antagonistic attitude toward the prosecuting attorney who, as we have said, was trying this case for the second time, had tried another criminal case involving the charge of false registration as a voter, and had for long represented appellant's wife in domestic difficulties between them. It was appellant's expressed belief he was the subject of persecution at the hands of the district attorney. As his cross-examination proceeded he volunteered direct charges that the district attorney was not acting in good faith and at one time declared that he was "full of chicanery." At another time he challenged the district attorney to take the stand and submit to examination touching his good faith. In this atmosphere it was hardly

to be expected that the most devoted judge, endeavoring unsuccessfully to curb the outbursts of the appellant and keep the trial in progress, should find his temper strained. We think that probably explains what happened, as we will now relate. There were numerous occasions throughout the trial when the court, the prosecuting attorney, the defense counsel and appellant, with the reporter in attendance, retired to the judge's chambers to discuss legal questions. During one of these appellant called the trial judge's attention to certain statements he said the district attorney had made relative to his representation of the appellant's wife and to a dispute between himself and the prosecuting attorney as to the time when that representation had ceased. After the appellant resumed the stand he volunteered the statement that the prosecuting attorney had told the judge of the court in the first trial that he hadn't represented appellant's wife for six months. Then, addressing the prosecuting attorney, he said, "And you told this Judge in chambers that you hadn't represented my wife for nine months. I defy you to go on the witness stand and explain. . . . THE COURT: This court cannot let go unchallenged the statement of this witness that Mr. Berliner made representations to me—— THE WITNESS: He did, in your chambers. He said he hadn't represented my wife in nine months. THE COURT: That is not true. I have no such recollection." On the following morning, in another conference in chambers, it was shown that the witness had been right and the judge had been wrong in his recollection of what had been said by Mr. Berliner. Following that conference the court addressed the jury, saying: "——when the court stated yesterday that it had no remembrance of Mr. Berliner making a statement that he had not represented Mrs. Kennedy for a period of nine months, I will state to you that the Court was in error, because in a conference in chambers Mr. Berliner did make that statement. I had forgotten it, but I was in error and I very freely and gladly admit it." Appellant strenuously insists that in effect the trial judge called him a liar in front of the jury and that he was prejudiced to the point where the prejudice could not be eliminated. We think that the appellant paints the picture with colors much more lurid than are justifiable. We do not believe that the incident was one which prejudiced him.

Appellant makes many charges of misconduct by the prosecuting attorney, asserting that the purpose and the result

was to deny him a fair trial. We think that in most instances the charges lack substance. There are two, however, that cannot be so considered. After a character witness had testified that appellant bore a good reputation for truth, honesty and integrity in the community in which he had been living for a number of years and in which the alleged crime was charged to have been committed, the prosecuting attorney asked the witness if "he had heard the report that Charles Kennedy was a bigamist and had two wives." Objection to the question was sustained and the prosecuting attorney was instructed to confine his questions to the issues of truth, honesty and integrity. This instruction was correct since the character traits involved in the charges of theft by trick and device are not those involved in a charge of bigamy. Notwithstanding the instruction, the prosecuting attorney immediately thereafter asked the witness if he had "heard the report . . . that Charles Kennedy falsely represented himself as a member of the FBI." Although the dissimilarity of the traits involved was not here so apparent as in the question concerning bigamy, yet it is substantial and the court quite properly sustained a second objection to that question and told the jury to disregard it. These questions clearly put the defendant in a bad light and it is a fair inference that they were intended to prejudice him. Even where the questions concern reports in the community of traits similar to those to which the reputation testimony is addressed, which is not the case here, the cases require that good faith be exercised and practical considerations make it necessary that prosecuting attorneys should be scrupulously fair in this regard because exposure of bad faith, if it exists, is often impossible during trial; and attempts at exposure may well leave the defendant worse off than if he had suffered the attack in silence. ■■■ A second instance of misconduct occurred after a conference had been held in the judge's chambers, attended by the judge, the prosecuting attorney, the reporter and appellant with his counsel. When the conference was over the prosecuting attorney returned to the courtroom in advance of the others. The jury was still in the jury box and the witness, concerning whose examination the question arose, was still in the witness chair. The others present during the conference entered the courtroom later. When they came in it was observed that the prosecuting attorney was standing by the jury box interrogating the witness. This was serious misconduct. Although a showing was made that nothing prejudicial had actually occurred by reason of

the questions asked the witness, and his answers thereto, nevertheless the vice of the conduct of the prosecuting attorney lay in his having actually interrogated a witness before the jury in the absence of defendant and his counsel. That conduct could not be excused on the basis that improper questions or prejudicial answers had neither been asked nor given. It was the right of the defendant to be present with his counsel at all times during the progress of the trial and the acts of the prosecuting attorney had violated that right.

For the reasons given the judgment must be reversed as to Count I. The judgment as to Count III must fall also. The two are so interwoven that it is improbable a conviction would have been obtained as to the charge of theft of the $300 payment on the note if appellant had been found not guilty of "stealing" the note.

The judgment and the order are reversed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied June 9, 1960, and respondent's petition for a hearing by the Supreme Court was denied July 6, 1960.