[Crim. No. 13703.   Second Dist., Div. Five.   July 25, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. FELIX GUZMAN CRUZ, Defendant and Appellant.

Dudlely Gray for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Gerald H. Genard, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, P. J.—Shortly before midnight on September 20, 1966, defendant and Betty Jo Hales were in the living room of defendant's apartment. Betty Jo was not wearing clothes. Defendant was holding a bolt action Enfield rifle, which discharged two bullets within a space of about three seconds. They entered Betty Jo's body, one below her right breast and the other to the right of her navel. Both wounds were fatal. Defendant immediately went to the apartment of his landlady and announced that he had shot Betty Jo, but that he did not know why. He asked that the police be called. He did not claim that the shooting was accidental.

A little over an hour after his arrest defendant had a sixty-five-minute conversation with two police officers which was tape recorded. Defendant's version of the events leading to Betty Jo's death was entirely exculpatory, at least as far as a charge of murder is concerned. He claimed that he was demonstrating to her how the bolt action of the weapon inserted and ejected shells. He thought that he had put only empty shells into the magazine. Suddenly the rifle went off. He could offer no explanation for the second shot which, of course, was a mechanical impossibility unless someone oper-

ated the bolt to eject the empty shell and to insert a live round.

Only four empties were found in the apartment. One was near the couch on which the body of Betty Jo was found, the other near a breakfast bar about five feet away. The other two were on a twin bed in the bedroom. Defendant was charged with murder. A jury found him guilty of murder in the second degree.

On appeal defendant raises two issues: 1. that it was error to admit certain, apparently enlarged, color photographs showing portions of Betty Jo's body after an autopsy had been performed; and 2. that it was error not to allow him to present to the jury the tape recording of his interview with the police.

At the trial the People made a determined effort to prove deliberation and premeditation rather than merely malice aforethought. (*People* v. *Holt*, 25 Cal.2d 59 [153 P.2d 21].) In general this is what they had to work with: Betty Jo's body was marked by more than entry and exit wounds attributable to the bullets. Most obvious was a cut, several inches in length, below her left shoulder. On the inside of her right breast was an abrasion, also several inches long, shaped like a W. There was also a scratch across the right nipple. There appeared to be one scratch and one deep abrasion on the lower right side of the right breast. There were numerous scratches or abrasions on the right arm. One scratch or abrasion appeared near the navel, another one in the area of the right loin. Both thighs showed that someone—at some point in the past—had cut her skin in what, at the trial, was referred to as a "tic-tac-toe" pattern.[1] Fresher cuts appeared inside of the tic-tac-toe pattern on each thigh.

The autopsy revealed that Betty Jo had not had intercourse shortly before her death. A pair of slacks with ladies panties inside was found in the bedroom. There was human blood on both legs of the slacks and on the panties, which were also stained with seminal fluid. The slacks were torn underneath the zipper. A shredded pair of men's trousers was found in the same room. A brassiere, wet with blood, was found on the floor outside the bathroom. A knife in defendant's possession had traces of blood on it, as well as fibers which were similar to those of which the trousers were woven. It could not be

---

[1] Defendant testified that he had noticed the marks in August. He asked her about them. She replied: "Never mind, I just got them."

determined whether the blood on the knife was human. Live ammunition was found both in the bedroom and in the living room. One box of ammunition appeared to have been torn open.

The markings on the empty shells were such as to indicate that the bolt had been worked slowly.

Amazingly enough—and the defense made the most of it—the apartment was otherwise tidy and there was no evidence of a struggle, nor any blood on the floors.

Defendant's trial version of the event was much like the one given to the police. It suffered from a certain amount of inherent improbability. Defendant never could explain the second shot.[2] He was quite unable to give a satisfactory account of Betty Jo's wounds and the discarded and damaged clothing found in the apartment. According to him, all of a sudden Betty Jo entered the living room without clothes, dabbing at the wound above the left breast with a white cloth. No such cloth was ever found. She said that she had cut or scratched herself. He never did notice Betty Jo's numerous other lesions. He believed he was wearing clothes at the time. Then there followed the demonstration of the rifle—he thought at her request—and the unexpected first shot.[3]

The above is a short outline of the salient facts. Obviously any finding of deliberation and premeditation to make the killing first degree murder had to be based on circumstantial evidence. The fact that ultimately the jury did not find that such deliberation and premeditation were established beyond a reasonable doubt, does not mean that the prosecution was not entitled to prove every circumstance which reasonably could be interpreted to point in that direction. The claim with respect to the photographs must be examined in the light of that obvious premise.

■ At the outset of the trial defendant made a general objection to the post-autopsy pictures, on which the court refused to rule at that time. In connection with his objection

---

[2]Defendant had been able to introduce a certain amount of mechanical evidence which made it possible for the jury to believe that the first shot was accidental.

[3]This is defendant's explanation of the second shot: ''. . . I don't know, I—— I got—— I got scared and I—— I guess I was frightened. And then I saw her just sort of look at me, and I pulled the bolt back again. *And I shoved it forward* and then it went off again. I·don't remember at that particular time having the—— having grabbed the rifle with my finger in the trigger or not. I don't remember that. But the gun went off again. Then I just pulled the bolt back again and dropped the rifle on the couch and ran outside.'' (Italics added.)

defendant offered to stipulate "that the cause of death were two gunshot wounds which the coroner has referred to in his autopsy report as gunshot wound 1 and gunshot wound 2; that both of these gunshot wounds were fatal and that they were the cause of death of the deceased. . . ."

Defendant still urges that his offer to so stipulate made the matters shown by the photographs immaterial. That position is quite untenable. The real issue at the trial was not the mechanical cause of Betty Jo's death, but the state of mind of the defendant during the minutes that preceded it.

As defense counsel argued to the jury, just exactly what happened in defendant's apartment before Betty Jo's death is known only to defendant "and God." Whether there was a sadistic-masochistic relationship between defendant and Betty Jo, whether or not defendant was made jealous by the tic-tac-toe pattern that was possibly inflicted by someone else or whether Betty Jo's wounds—obviously not self-inflicted, if she was normal—were caused during a fight having a more conventional origin, it cannot be denied that they throw some light on the defendant's mental state. (*People* v. *Arguello,* 65 Cal.2d 768, 775-776 [56 Cal.Rptr. 274, 423 P.2d 202].) No one but he and Betty Jo were in the apartment before the shooting. The evidence that the fresher wounds were inflicted by defendant is overwhelming, particularly when considered in connection with the bloody brassiere, and the stained and torn clothing.

Defendant argued below that even if relevant, the photographs were unnecessary in view of other evidence. There was, of course, the testimony by the autopsy surgeon. We have read it. The dry medical terms used by the witness are really inadequate to describe the wounds. There is one black and white photograph of Betty Jo showing just the cut below the right shoulder and a short wound on the left breast, but nothing else. There is a full length black and white picture of Betty Jo lying on a table at the morgue. The wounds show up quite poorly.

There was also admitted in evidence a color picture of Betty Jo lying on the couch where her body was found. It exposes mostly her right side and very few of the wounds are visible.

We have examined the color pictures to which the objection was made. They are, as the cliche goes, not pretty. Apart from the lesions, the most prominent feature of the photographs is a Y-shaped autopsy incision. The upper arms of the Y start

above each breast. They join between the breasts. The vertical portion then goes down to just above the pubic area.[4] The incision was sutured at the time the photographs were taken. The result of the suture was an effect looking rather like a cable stitch.

We have no doubt that the probative value of the photographs far outweighed any prejudicial effect. (*People* v. *Nye*, 63 Cal.2d 166, 170 [45 Cal.Rptr. 328, 403 P.2d 736]; *People* v. *Schader*, 62 Cal.2d 716, 733 [44 Cal.Rptr. 193, 401 P.2d 665]; *People* v. *Arguello*, 61 Cal.2d 210 [37 Cal.Rptr. 601, 390 P.2d 377]; *People* v. *Ford*, 60 Cal.2d 772, 801 [36 Cal.Rptr. 620, 388 P.2d 892]; *People* v. *Henderson*, 60 Cal.2d 482, 495 [35 Cal.Rptr. 77, 386 P.2d 677].) Indeed, under the baffling circumstances of this case, it might well have been an abuse of discretion not to have admitted the pictures.

We turn to the exculpatory tape recording. Defendant claims that it is admissible because it showed his state of mind, because it was part of a verbal act, because it was a part of the res gestae, because it was a spontaneous statement and because it shows no consciousness of guilt.

The tape was not admissible to show defendant's state of mind, although it was relevant on that issue. The ultimate fact which the jury had to decide was defendant's state of mind immediately before and at the time of the shooting. The tape contains some[5] direct assertions to the effect that the shooting was accidental, in other words that defendant did not harbor malice aforethought and did not deliberate or premeditate.[6]

---

[4]Doctor Noguchi, the autopsy surgeon, explained: ''Well, this is a usual Y-shaped technique for performing an examination of internal organs. It is called a Y-shaped autopsy incision.''

[5]We note in passing that the defense took an ''all or nothing'' approach to the tape. When defendant was cross-examined by the prosecutor he made two statements possibly at odds with what he said on the tape. He denied having told the police anything different than what he testified at the trial. At the end of the trial, but before argument, the defense again offered the tape, giving as an additional reason for its admissibility the fact that the prosecutor's questions to defendant suggested a changed version. The court said that it would permit the portions of the tape involved. The defense declined because ''playing it piecemeal like that that [*sic*] things are taken out of context and the jury doesn't get the full import . . . so the record might be clear, our motion is to introduce the entire tape.''

[6]The case was tried in December 1966, before the Evidence Code became effective. Direct assertions of a declarant's former state of mind, where it is in issue, are made admissible by section 1251 of the code, if the declarant is unavailable. If the declarant is a defendant in a criminal action, he would not be able to take advantage of section 1251 because his privilege not to become a witness does not make him unavailable.

The leading case holding that assertions concerning a former state of mind are sometimes admissible is *People* v. *One 1948 Chevrolet Convertible Coupe*, 45 Cal.2d 613, 620-622 [290 P.2d 538, 55 A.L.R.2d 1272]. There the statement was made by a person who had just been arrested. It was to the effect that he had known that an occupant of an automobile that had been entrusted to him, the declarant, had marijuana in his possession. After an exhaustive survey of California law the Supreme Court held that the declaration was admissible against the registered owner and hence against the legal owner of the automobile in a forfeiture proceeding: ''. . . The matters admitted were within his special knowledge, the hearsay dangers of faulty perception and memory were not present, there was no apparent motive for misstatement, and the fact that his statement was not only against his interest in the possession of the vehicle as well as his mother's interest therein, but against his interest penally, gives reasonable assurance of his veracity. Under these circumstances Phillips' statement was admissible to prove that he knew at the time of the seizure of the vehicle that there was a narcotic therein.'' (*Ibid.*, p. 622.)

Defendant's taped statement carries but few of the indicia of trustworthiness mentioned by the Supreme Court. Granted that the statement was given only a short time after the event, defendant had the strongest possible motive for misstatement; what he said was not against his penal interest but, considering the circumstances, quite the opposite. (See *People* v. *Lew*, 68 Cal.2d 774, 780 [69 Cal.Rptr. 102, 441 P.2d 942].

We have found no California case which permits a declaration concerning a former state of mind in a similar situation.

The taped statement was also relevant, though more tenuously, if it contained declarations concerning defendant's present state of mind—such as expressions of grief and sorrow over Betty Jo's death—from which it could be inferred that a little while earlier he had not wanted her dead. ▮ Ordinarily, where a former state of mind is directly in issue, declarations of a present state of mind which throw some light on the former state, are admissible. (*Watenpaugh* v. *State Teachers' Retirement System*, 51 Cal.2d 675, 679 [336 P.2d 165]; Witkin, Cal. Evidence (2d ed. 1966) § 564.)

---

Defendant, as a party, was in a position to control his availability. (See comment on Evid. Code, § 240: ''Moreover, if the out-of-court statement is that of the party himself, he may not create 'unavailability' under this section by invoking a privilege not to testify.'')

358

We find it somewhat difficult to say that the tape really does contain any expressions of a present state of mind which, even if believed, indicate a lack of desire to see Betty Jo dead when defendant did the shooting; but reasonable minds may differ on that point and we do not rest our decision on that ground.

▇ The admissibility of declarations of a present state of mind is also subject to the rule of trustworthiness. *People* v. *Alcalde,* 24 Cal.2d 177 [148 P.2d 627], involved a declaration of a present state of mind from which an inference concerning the declarant's future conduct was drawn. The court said with respect to the declaration: "Elements essential to admissibility are that . . . it must have been made under circumstances which naturally give verity to the utterance . . ." (*Ibid.,* p. 187.)

We think that rule applies whether the declaration is intended to explain the future or illuminate the past. (See also *People* v. *Hamilton,* 55 Cal.2d 881, 893-900 [13 Cal.Rptr. 649, 362 P.2d 473].)[7]

▇ We conclude that the lack of trustworthiness of the taped interview excludes it from the "state of mind" exception to the hearsay rule.

▇ If we correctly analyze defendant's contentions, he also claims that the tape was admissible because his demeanor —to the extent that one can perceive it from the tape—was nonassertive. If that is true, there really is no hearsay problem . (Evid. Code, § 225.)

After listening to the tape we find it very questionable whether defendant's tone of voice or manner of speech are much of a clue to anything. If there was any relevance to the nonassertive aspects of the tape, it was completely drowned out by the repeated, inadmissible, assertions of innocence. An instruction to the jury, commanding it to disregard the assertive features of defendant's statement would have been received with incredulity. The situation is the opposite from that presented in *Shepard* v. *United States,* 290 U.S. 96, 104 [78 L.Ed. 196, 201, 54 S.Ct. 22], quoted in Justice Traynor's dissent in *Alcalde*: " '. . . The reverberating clang of those

---

[7] We note that section 1252 of the Evidence Code makes declarations concerning a present or past state of mind inadmissible if they are made under circumstances "such as to indicate [a] lack of trustworthiness." The comment to the section, though somewhat critical of some of the reasoning in *People* v. *Hamilton,* 55 Cal.2d 881, 893-895 [13 Cal.Rptr. 649, 362 P.2d 473], makes it clear that at least the California Law Revision Commission and the Legislature thought that it stated existing law.

accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed.'" (*Ibid.*, p. 190; see also *Estate of Anderson*, 185 Cal. 700, 719 [198 P. 407].)

■ The tape recording was not admissible as part of a verbal act. The verbal act doctrine was codified in section 1241 of the Evidence Code.[8] It restates the law applicable at the time this case was tried. As one of the cases cited by defendant—*People* v. *Kennedy*, 180 Cal.App.2d 862, 869 [4 Cal. Rptr. 862]—points out, one of the requirements then, as now, is that the words must accompany the conduct. (See also 6 Wigmore, Evidence (3d ed. 1940) § 1772, p. 190.) That was not the case here.

■ The tape recording was not admissible as part of the res gestae because there is no such exception to the hearsay rule (6 Wigmore, Evidence (3d ed. 1940) § 1767, p. 180; McCormick, Evidence, p. 585.)

■ The tape was not admissible as a spontaneous statement. If the trial court had admitted it as such and the People claimed the ruling to be error,[9] we would find it very difficult to sustain the ruling. The requirements for the admissibility of hearsay declarations as spontaneous statements were set forth in *Showalter* v. *Western Pacific R.R. Co.*, 16 Cal.2d 460, 468 [106 P.2d 895]. They need not be restated at length. One of them—"the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance"—is obviously lacking. To be sure, if one has killed another human being the nervous excitement caused by that event may last for hours, even for days, months or years. There usually comes a time, however, when the instinct for self-preservation also comes into play and reanimates the reflective powers.

The tape contains intrinsic evidence that this was the case here. While the defendant's voice does show a certain amount of emotion, that is so only at times. Many questions he answered quite coolly. Furthermore, several of his statements

---

[8]§ 1241. "Contemporaneous statement. Evidence of a statement is not made inadmissible by the hearsay rule if the statement:

"(a) Is offered to explain, qualify, or make understandable conduct of the declarant; and

"(b) Was made while the declarant was engaged in such conduct."

[9]As they can do on an appeal by defendant. (Pen. Code, § 1252.)

are simply irreconcilable with the physical evidence found in the apartment.[10]

A case right in point is *People* v. *Fain*, 174 Cal.App.2d. 856 [345 P.2d 305]. After an automobile accident Fain was tried and convicted of manslaughter. Very shortly after the accident Fain, who appeared unconscious and was lying on the sidewalk, said to a police officer that his "buddy" had been driving. His statement was not admitted. The court held that under the circumstances of the case there was no abuse of discretion. There were certain factors in the situation which gave Fain a strong motive to lie, even though he did not then know that someone was killed.

*Fain* also disposes of any contention, based on *People* v. *Keelin*, 136 Cal.App.2d 860 [289 P.2d 520, 56 A.L.R.2d 355], that, as the law stood before the Evidence Code, the court must admit a hearsay declaration as a spontaneous statement if there is any evidence qualifying it as such.[11]

Arguing for admissibility of exculpatory statements to show lack of consciousness of guilt—or more positively, to show consciousness of innocence—defendant refers us to a suggestion by Professor McCormick (McCormick, Evidence, § 275, p. 589) that statements of an accused, in homicide and assault cases made before *or after* the event, protesting the accused's peaceful intention, should be admissible " [i]f made under circumstances of seeming sincerity."[12] Even if McCormick's suggestion were the law, we have already held that the circumstances presented here are not "of seeming sincerity."

It appears that Professor Wigmore would go further than McCormick. At one point (2 Wigmore, Evidence (3d ed. 1940) § 293) he argues for a rule making evidence of "con-

---

[10]With respect to the necessary operating of the bolt to fire the second round, the taped version is that defendant did not recall doing so.

[11]*People* v. *Keelin* laid down the novel doctrine, abolished by section 405 of the Evidence Code, that spontaneous statements should be handled like confessions and dying declarations were at that time, that is to say, that after an initial ruling by the court, the jury is instructed concerning the conditions of admissibility and told to disregard the statement, if it finds that they have not been met. It is not clear from *Keelin* whether the court meant that the statement must be heard by the jury if the evidence concerning the conditions of admissibility is conflicting, but there are facts which would justify a finding that the preliminary facts are true.

[12]McCormick cites *People* v. *Smith*, 15 Cal.2d 640, 648-649 [104 P.2d 510], as being contra to his views. *Smith* involved declarations showing the defendant's state of mind *before* the murder. This court held in *People* v. *Farr*, 255 Cal.App.2d 679, 688 [63 Cal.Rptr. 477] that the rigidity of the rule applied in *Smith* has been softened by sections 1250 and 1252 of the Evidence Code.

sciousness of innocence'' admissible, though he realizes that most of the cases, including two from this state (*People* v. *Montgomery*, 53 Cal. 576, 577-578; *People* v. *Shaw*, 111 Cal. 171, 176 [43 P. 593]), are against him. Later, Wigmore returns to the same theme (4 Wigmore, Evidence (3d ed. 1940) § 1144) arguing that exculpatory statements of an accused, ''made before or upon accusation'' should be admissible. Later still (6 Wigmore, Evidence (3d ed. 1940) § 1732), he asserts that statements ''after the act, stating the past intent or motive'' should, ''in common sense,'' be received. Some of his language is pretty strong.[13] Yet one of the cases he recognizes as being against him is *People* v. *Perkins*, 8 Cal.2d 502, 513-514, 516-518 [66 P.2d 631]. (See also cases collected in McK. Dig. ''Criminal Law'' § 452.)

We reaffirm the California rule to the effect that exculpatory extrajudicial statements of a defendant, not otherwise admissible under an exception to the hearsay rule, are not admissible because they indicate a lack of consciousness of guilt.

There is, however, one troublesome dictum in a California case cited by defendant, which needs to be mentioned. The case is *People* v. *Cartier*, 51 Cal.2d 590 [335 P.2d 114].

Cartier had apparently killed his wife and then set fire to the room where her dead body lay. He had been drinking quite heavily. His defense at the trial was a lack of memory from the time he and his wife were at a certain bar until the time of his arrest. The police had tapes of three interviews with Cartier, the first one having taken place about two hours after the arrest. Cartier had slept at least some of the intervening time. One of the interviewers was Sergeant DeVore who became a witness at the trial. The report tells us very little about DeVore's testimony concerning Cartier's statements. It does mention that DeVore testified that Cartier had said that his wife drove home from the last bar. In truth defendant had told the officer that he could not recall the drive home. The defense asked for an inspection of the tape. The request was denied. The Supreme Court held that the

---

[13]''. . . [A] flagrant instance of the dogged and needless cruelty to which our technical methods lead . . . it seems incredible that a court of a nation regarding itself as modern and rational can consent to enforce such a rule as a part of a supposed rational system of proof; the blind bigotry of the Middle Ages, in its religious persecutions, otherwise incomprehensible to us, becomes understandable when we perceive kindly, accomplished, highly trained gentlemen applying without a tremor such a piece of cruel stifling technicality as this. . . .'' (*Ibid.*, p. 104, fn. 11.)

ruling was error, since the tape obviously impeached DeVore's testimony with respect to defendant's recollection of the drive home. That having been said the point was decided, but the court continued at page 598:

"The recorded interviews contained other evidence that would have been of material benefit to defendant and his counsel in preparation of his defense. It showed a lack of consciousness of guilt on the part of defendant, which fact would have been material to the jury in determining the weight to be given Sergeant DeVore's testimony. It appears that although the interviews took place only a couple of hours after defendant's arrest, defendant had been sleeping in his cell until called to the interrogation room; and that up to that point in the interrogation defendant had not been too alert and bright. It also appears that when the interrogator asked defendant if he would then like to see his wife, defendant answered, 'Yes.'[14]

"The facts that defendant was asleep in his cell and desired to see his wife are inconsistent with a consciousness of guilt on the part of defendant for the mutilated condition of the victim and would tend to substantiate his defense of a 'blackout' or intoxication sufficient to render him incapable of forming the intent necessary to constitute premeditation. These matters were known to the prosecution and the trial judge but were not known to defendant or his counsel. Obviously, under these circumstances the error was prejudicial, and defendant was improperly deprived of his right to inspect relevant and material evidence in the hands of the prosecution."

Defense counsel concedes that the two paragraphs just quoted do "not stand for the proposition that the jury is entitled to hear the tape recording." He urges, however, that it is "a logical sequence of reasoning that if it is error to deprive a defendant and the defense counsel of the right to hear such recording, then it must likewise be prejudicial error to deprive the trier of fact, in this case the jury, from hearing such recording."

Though we doubt the logic of this assertion, it may be that defendant concedes too much. Disregarding the fact that the

---

[14]The record in *Cartier*, though not the opinion, shows that at the time of the first interview Cartier was aware of the fact that his wife had died a violent death. Was the court thinking of the cases, mentioned in 2 Wigmore, Evidence (3d ed. 1940) section 275, page 110, holding it admissible, show consciousness of guilt, that the defendant refused to touch the corpse of the victim?

quoted passage is dictum, it is difficult to deny that it at least implies that the portions of the tape which supposedly show a lack of consciousness of guilt could have been brought to the attention of the jury; and even if the Supreme Court mainly focuses on their value "in determining the weight to be gievn Seregant DeVore's testimony," it is hard to see how that was to be accomplished except by contradicting him with matter relevant on the merits. One of the problems is, of course, that the report tells us so little about what DeVore had testified.

We think that the only thing we can do with *Cartier* is to mention it and to hold that, if the passage quoted implies that an extrajudicial statement by a defendant which is inconsistent with a consciousness of guilt is admissible in evidence, it is *dictum.* Certainly *Cartier* has never been cited for so startling a rule.

Finally defendant claims that the reason his statement was rejected is that it was "self-serving" and that there is no such ground of exclusion. (See McCormick, Evidence, § 275 p. 588.) We agree that it would be best if we all dropped the term "self-serving" from our vocabulary. Highly self-serving statements are admissible if they satisfy the requirements of a particular exception to the hearsay rule.

Although both the trial court and the prosecutor used the term "self-serving" at least once, it is plain that the tape was rejected because it was hearsay.

The judgment is affirmed.

Hufstedler, J., and Stephens, J., concurred.