[Crim. No. 6853. In Bank. Nov. 22, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. HENRY
ADOLPH BUSCH, Defendant and Appellant.

870

■■■■■■■■■ ■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

Matthews and Stanley, Robert W. Stanley and Al Matthews for Defendant and Appellant.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

WHITE, J.—A jury found Henry Adolph Busch guilty of murder in the first degree in one count, guilty of murder in the second degree in each of two additional counts, and guilty of assault with intent to commit murder as charged in a fourth count. The jury fixed the penalty at death as to the count of first degree murder, and as to each of the other counts defendant was sentenced to imprisonment for the term prescribed by law, sentences to run concurrently. Defendant's motions for a new trial and to reduce sentence as to the count of first degree murder were denied. The appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Defendant lived alone in an apartment in Los Angeles, is 29 years of age and has no prior criminal record. He was regularly employed in an optical factory, and on occasions had coffee prior to commencing the day's work with a fellow employee, Mrs. Magdalena A. Parra. On the morning of September 6, 1960, the day following Labor Day, the place where defendant went for coffee was closed. He met Mrs. Parra nearby and asked her if she wished to ride in his automobile to another place for coffee. She accepted the invitation. After both were in the automobile defendant attacked Mrs. Parra with his hands, attempting to strangle her. She screamed, fought him off and escaped from the automobile. Defendant tried to start the automobile but flooded the engine. He abandoned his automobile and ran from the scene but was pursued by two truck drivers who caught him. Police officers who arrived at the scene searched defendant and found a knife and a pair of handcuffs on his person.

After defendant was in a police car and on his way to the station, he volunteered that he had killed two other women, both during the preceding week end, and offered to lead the officers to their bodies. While the officers were investigating these crimes, defendant admitted killing a third woman in May of that year. All of the defendant's murder victims

were elderly women who had been friendly to him. The following account of the killings is taken in large part from extrajudicial statements and confessions made by defendant to various investigating officers, and from three recorded confessions which were read into evidence at defendant's trial. No impropriety is claimed or appears in connection with receiving the confessions into evidence. Except for details hereinafter noted, the confessions and statements are generally consistent with each other. Defendant did not take the stand as a witness in his own behalf.

The defendant in his various statements to investigating officers told them that in the early part of May 1960 he paid a visit to the apartment of Mrs. Elmyra Miller, a woman in her seventies and a friend and confidante since his childhood. They talked for an hour, and watched television. When he arose to leave at 9 or 10 in the evening, Mrs. Miller was standing with her back to him. He states that he felt an impulse to kill her and, placing his left arm around her neck from behind, he strangled her to death. He left her on the floor, pulled her housecoat over her hips and tore her underclothing to make the killing appear to be a sex crime. He hoped that this would direct the attention of investigating officers to a possible sexual assault and thus avoid implicating himself. He locked the front door of the apartment and left by the rear. The body was found by Mrs. Miller's doctor on a regular call on May 2, 1960. The physical appearances at that time were consistent with the defendant's various accounts of the murder. For this killing defendant was convicted of murder in the second degree.

On Saturday or Sunday before Labor Day in 1960, in the late afternoon, defendant went to the apartment of his mother, a half sister who had adopted him. She was not at home, but at the door of the apartment defendant met Mrs. Shirley Payne, a woman approximately 65 years of age, who lived in the apartment above his mother's apartment. He invited her to attend a local theater where the film "Psycho" was showing. She accepted, and after viewing the motion picture defendant invited Mrs. Payne to his apartment, where they drank some beer and, according to defendant, engaged in sexual intercourse. As Mrs. Payne prepared to leave at about 8 p. m. he had an urge to kill her and applied an arm lock around her neck from behind her. He stated that she placed her hands in an attitude of prayer while he strangled her. He then placed a belt around her neck to stop some

drainage from the mouth and wrapped the body in a bed sheet, intending to move it when it was darker. However, he went to sleep and did not awaken until the following morning. The body had been bleeding from the mouth and nose, and he became concerned that such bleeding would leave stains in his apartment. He purchased a waterproof sleeping bag, trussed the body up, placed it in the sleeping bag, and tied the sleeping bag with a rope. The body was trussed in a manner similar to that illustrated in a picture drawn by defendant at about the time of the killing. Defendant remained in the apartment with the body until late Monday evening when he left, and he did not return again until after his arrest for the assault. He was convicted of murder in the second degree for the killing of Mrs. Payne.

On Monday evening, September 5, 1960, defendant went to the apartment of Mrs. Margaret Briggs. Mrs. Briggs was a half sister of defendant's half sister (his adoptive mother), although the common parent was different in each case. He took with him the manacles which were in his possession when apprehended, and a knife. He regarded Mrs. Briggs as an aunt, and often sought her advice and counsel. He stated that he considered telling her about the killing of Mrs. Payne, but he did not do so. They watched television together until 2 a. m. Thereafter, while she was standing in the middle of the room, he grabbed her from behind with his left forearm across her throat and strangled her. She struggled more than the others, knocking over furniture. He stated that he was sorry to kill her, but that he could not overcome the urge which compelled him to take her life. Thereafter he cut the clothing from her body, cutting her breast in the process. There appeared to be some cigarette burns and other small wounds about the body which he did not explain, and there were numerous bruises about the body and scalp. Defendant remained in the apartment that night, and early the next morning, after examining the contents of Mrs. Briggs' purse, took her keys and station wagon and drove to his place of employment. Near there he met Mrs. Parra and the assault heretofore mentioned took place. Defendant was convicted of first degree murder for the killing of Mrs. Briggs.

As stated, defendant did not testify in his own defense, and no opportunity was presented to reconcile some inconsistencies in his various statements. Notably in this respect is a conflict as to whether he killed Mrs. Payne on Saturday

or Sunday evening. The testimony of other witnesses would indicate that the killing occurred on Sunday evening, however.

Defendant stated in response to interrogations of a psychiatrist who testified thereto that often he would be possessed of an urge to kill another human being. This urge commenced with the killing of a prisoner of war entrusted to his care while in the military service. He normally would control these urges, he stated, and he knew in each instance when he had killed or had an urge to kill that it was wrong to do so. He stated further that he probably would have taken Mrs. Parra to some lonely spot, perhaps in Griffith Park, and killed her. He kept the handcuffs and a knife with him in order to make it possible to immobilize his victims and force them to keep quiet. He admitted that had he been successful in killing Mrs. Parra he probably would have continued to satisfy his ''urge'' to kill.

At the trial it was contended that defendant was mentally ill; that he did not act with deliberation on the occasions in question, and that he was motivated by uncontrollable physiological forces. In support of such contentions a psychologist who examined defendant following his arrest was of the opinion that defendant was of low intelligence, incapable of deliberating and reflecting upon his homicidal tendencies. A psychiatrist who studied defendant and his case history, diagnosed defendant as a schizoid personality with repeated schizophrenic outbursts. In his opinion none of the killings were accompanied by a clear deliberate intent to take life. It was stipulated that the physician who attended at defendant's birth would testify that defendant's mother had an epileptic seizure during delivery, and that defendant was anorexic and suffered from malnutrition for six weeks following his birth. Except as hereinafter appears there was no other expert medical testimony offered by either party concerning defendant's mental condition. His adoptive mother testified that in her opinion defendant had never been normal.

Defendant contends first that the deputy district attorney improperly sought to establish that defendant had beaten Shirley Payne about the face and head before killing her. In support of this theory the deputy district attorney sought to establish that defendant experienced a sadistic sexual orgasm as the result of such a beating, rather than the conventional sexual intercourse which defendant claimed. Such facts were sought to be established through hypothetical questions asked of one of the expert medical witnesses for the

defendant on cross-examination. It is claimed that the questioning was improper because it was necessary to assume a fact not in evidence, that being the claimed beating about the face of Shirley Payne. In support of the prosecution's theory, the coroner had testified that there was no evidence that Mrs. Payne had engaged in a normal sexual act shortly before her death. Photographs had been introduced showing a marked discoloration on her face and shoulders. However, the coroner had testified that in his opinion most of the discoloration was due to post-mortem decomposition and from the effects of the strangulation. The defense objected to the hypothetical questions, but the objections were overruled, and the photographs were exhibited to the jurors with reference to the question of whether they bore evidence of a beating of the victim by the defendant. At a later time the coroner was recalled and testified that in his opinion there was no evidence of a beating about the face. As previously stated, there was evidence of numerous bruises of recent origin about the body.

The hypothetical questions were preceded by testimony of the medical expert to the effect that the defendant had admitted to him that on some prior occasion he had beaten a man, had become sexually aroused and had continued the beating for half an hour. The witness testified that he was not certain how he should evaluate what the defendant had told him. The hypothetical questions were asked in reference to a possible sadistic motive for the murders on the part of the defendant, and to establish whether the doctor had attempted to test his evaluation of the defendant on such a theory. The pictures were exhibited to the doctor in this connection. The doctor testified that the pictures submitted to him exhibited nothing more than normal post-mortem discoloring and did not support the theory. He testified, however, that it was possible that the defendant could have been motivated by sadistic tendencies, assuming the hypothetical beating and sexual involvement.

While it is generally held that a hypothetical question asked of an expert witness on cross-examination may not assume facts not in evidence, there is an exception where the purpose is to test the expert as to his accuracy or competency. (*People* v. *Ryan*, 140 Cal.App.2d 412 [295 P.2d 496] ; *McNutt* v. *Pabst*, 25 Cal.App. 177 [143 P. 77].) In testing the credibility of an expert a wide latitude is allowed. (*People* v. *Tallman*, 27 Cal.2d 209, 214 [163 P.2d 857].) ''While each hypothesis contained in the question should

have some evidence to support it, it is not necessary that the question include a statement of all the evidence in the case. The statement may assume facts within the limits of the evidence, not unfairly assembled, upon which the opinion of the expert is required, and considerable latitude must be allowed in the choice of facts as to the basis upon which to frame a hypothetical question." (*People* v. *Wilson*, 25 Cal.2d 341, 349 [153 P.2d 720].) In the instant case there was some evidence, although meager, which supported the prosecution's hypothesis. In view of the defendant's sadistic tendencies, testified to by the defendant's own witness, it was not unreasonable to infer that he was motivated in the manner suggested in the hypothetical question, in an attempt to rebut the same witness' testimony that the defendant was incapable of deliberation to kill. No harm was done in exhibiting the photographs to the jury, as they had already been properly admitted in evidence. Furthermore, we do not perceive in what manner defendant was prejudiced by the claimed error, nor is any argument made that he was so prejudiced. (Const., art. VI, § 4½.) It could not reasonably be contended, in view of other overwhelming evidence, that posing and answering the hypothetical question in any way was instrumental in bringing about the conviction of murder in the second degree in the case of Shirley Payne. (Pen. Code, § 187.) Had the jurors been persuaded by the testimony and believed that defendant beat Mrs. Payne for sadistic reasons prior to strangling her, a first degree conviction would have necessarily followed. (Pen. Code, § 189.)

Defendant's only remaining contention is that the proffered testimony of Dr. William J. Bryan, Jr., M.D., was improperly excluded. Dr. Bryan testified that he examined defendant on 13 separate occasions in respect to his mental condition at the time of the killings. In addition to the usual methods of examination, he used hypnosis as an analytical tool. The prosecution interposed objections as to questions asking for Dr. Bryan's opinion of the defendant's mental status at the times of the killings, and whether defendant could premeditate or deliberate on those occasions. The objections were made and sustained on the stated grounds that hypnosis is not a sufficiently scientific means of exploring the state of mind, that the witness was not qualified in this field, and that the opinions were formulated on the defendant's statements and constituted hearsay. The following offer of proof was then made, objected to and the objection sustained:

"That Dr. Bryan made an examination of the defendant, a medical examination, at the Los Angeles County Jail on the times that have previously been stated;

"That as a part of the examination he went into the medical determination of the mental condition of the defendant;

"That he used hypnosis as a method of enabling him to arrive at an opinion;

"That he did arrive at an opinion concerning the defendant's ability to premeditate, to form willful intent or to deliberate at the time that the killings which are the subject matter of this law suit were committed;

"That the doctor's opinion, based upon his examinations, was based partly upon the answers from the defendant that he received under hypnosis, together with his evaluation of all of the information that he received from the defendant, and that his opinion was that at the time that the defendant committed these particular killings that he was ·unable to form an intent to kill, that he did not deliberate nor did he premeditate."

In support of his qualifications, Dr. Bryan testified that he was a physician and surgeon, specializing in the use of hypnosis in medicine. He defined hypnosis as an altered state of consciousness in which there is increased concentration of the mind, increased relaxation of the body, and increased susceptibility to suggestion. Among other things, he stated that with hypnosis the subject can be taken back to a particular incident and the incident can be relived. He also related that under hypnosis there is always a certain part of the mind which is perfectly conscious and aware at all times of what is going on.

Dr. Bryan further testified that he was first licensed as a doctor of medicine in 1953 in California, and in Illinois and Nevada in 1954; that he was in the United States Air Force at the time he took his examinations; that he had a general practice of medicine in Nevada between 1955 and 1960; that he was not a psychiatrist, and that he became a specialist or commenced to specialize in the field of hypnosis on a full time basis in 1960, less than a year prior to his appearance as a witness. He acknowledged that he never had occasion to qualify as an expert witness in a criminal case on the subject matter of a defendant's frame of mind at the time he committed a crime, and that he knew of no other expert in this field who had become an expert witness by reason of a knowledge of hypnosis.

While sustaining the objections to the opinion evidence of Dr. Bryan, the court ruled that he was competent to testify as a medical doctor as to the defendant's mental condition, but that he was not competent to testify insofar as his opinions were based upon information dependent on the use of hypnosis.

Opinions based on hypnotic analysis have never been received in the courts of this state, or in any other jurisdiction to which defendant refers. In *Cornell* v. *Superior Court,* 52 Cal.2d 99 [338 P.2d 447], an attorney sought to have his client examined under hypnosis for the purpose of gaining information in preparing a defense, and was successful in a mandamus action. There the basic issue was the scope of the right of one confined in a penal institution to consult with his attorney and otherwise prepare his defense. In *People* v. *Marsh,* 170 Cal.App.2d 284 [338 P.2d 495], a psychiatrist was permitted to testify concerning the effects of hypnosis, where a defense was interposed to the effect that the accused was acting under a hypnotic spell when he committed the wrongful act. Neither of these cases lend aid in resolving the questions here presented.

Closest in point, perhaps, are cases involving the use of sodium pentothal (truth serum), wherein we have held that a psychiatrist is not precluded from giving his expert analysis of a subject's answers to questions while under the influence of the drug, for the purpose of determining whether, in the expert's opinion, the subject was sane (*People* v. *Cartier,* 51 Cal.2d 590 [335 P.2d 114]), or not a sexual deviate (*People* v. *Jones,* 42 Cal.2d 219 [266 P.2d 38]) at the time of a crime charged. It was said in the *Cartier* case at page 601: "In *People* v. *Jones* . . . this court held that although it is questionable whether results of an examination made while a person is subject to 'truth drugs' are admissible in evidence if the statements are offered for the purpose of proving the truth of the matter asserted, the use of such drugs does not preclude a psychiatrist from giving his expert analysis of defendant's answers to questions while under the influence of drugs for the purpose of determining whether, in the opinion of the psychiatrist, defendant was sane or insane at the time of the commission of the alleged offenses." On the other hand the latest expression of this court as to the admissibility of expert opinion evidence formulated through the use of a lie detector is as follows: "Lie detector tests do not as yet have enough reliability to justify the admission of

expert testimony based on their results. [Citations.]'' (*People* v. *Carter*, 48 Cal.2d 737, 752 [312 P.2d 665].)

In the instant case the witness conceded that this was his initial appearance in the role of an expert in a criminal case on the subject matter of an accused's state of mind; that he was not a psychiatrist and had engaged in the practice of medicine as a general practitioner until shortly before his appearance in the case at bar as an expert specializing in hypnosis. In laying a foundation for the introduction of opinion evidence of the state of mind of a defendant based upon the use of a technique not theretofore recognized by the courts as sufficiently reliable to form the basis for such an opinion, at the very least, some showing of its successful use in the examination of others than the defendant for the same purpose, either by the witness or by other experts in the field, would appear to be required. We are persuaded that under the circumstances herein narrated the trial judge did not act unreasonably in his determination that a proper foundation was not established as to the reliability of an analytical tool still seeking recognition in the field of psychiatry, or as to the qualifications of this particular witness to give an opinion on the state of mind of the accused on the occasion of the commission of the homicides herein. It must be remembered, ''. . . the general rule is that the trial court, in passing upon the qualification of a witness offered as an expert, has wide discretion, and an appellate court will not disturb its ruling in the absence of a manifest abuse of such discretion.'' (*People* v. *Chambers*, 162 Cal.App.2d 215, 220 [328 P.2d 236]; see also *People* v. *Goldsworthy*, 130 Cal. 600, 604-605 [62 P. 1074].) In the instant case no abuse of discretion is demonstrated and the trial judge justifiably sustained the objections presented by the record in this case to the admission of the offered opinion testimony based on the use of hypnosis.

No other contentions are advanced by the defendant. In spite of expert opinion evidence to the contrary there is other substantial evidence in support of the implied finding of the defendant's ability to deliberate and premeditate, and such finding and judgment of conviction of first degree murder flowing therefrom in the case of Margaret Briggs cannot be upset on this appeal. Defendant conceded that he knew it was wrong to take the lives of all of his victims at the time of the homicides. In the case of Margaret Briggs he brought with him to her apartment a knife and handcuffs which he carried with him for the avowed purpose

of subduing his victims. More than this in the instant circumstances need not be shown to sustain the conviction of first degree murder in her case. There is no contention that the elements of the other crimes were not sufficiently established, and the evidence thereof is overwhelming.

The judgment and order denying a new trial are affirmed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J., and Dooling, J., concurred.

Appellant's petition for a rehearing was denied December 20, 1961.