[Crim. No. 19718. First Dist., Div. Three. Nov. 25, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD DIGGS, Defendant and Appellant.

COUNSEL

Patricia Stern Green, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, William D. Stein and John W. Runde, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

RHODES, J.*—Donald Diggs was charged in an information filed November 8, 1978, with assault with intent to commit rape in violation of Penal Code section 220. The charge was based on the following facts.

On September 8, 1978, Susan A. went with some friends to Neptune's Table, a cocktail lounge on Fisherman's Wharf in Monterey, arriving at approximately 11:30 p.m. Soon afterward, she went to the restroom, walked into the first stall and closed the door. After a short time, she heard the outside door open and close. As she left the stall, she was seized from behind by a man who pushed her in front of him into the last stall, locked the door and began to molest her sexually. Thinking her assailant intended to rape her, Susan turned to face him and implored him not to hurt her. As a pretext, she told him that she was pregnant and that he was sure to kill her baby. After a brief exchange, the man released his victim and ran out of the restroom.

Susan was able to recall that her assailant was black, had a moustache, goatee, afro, and muttonchop sideburns, was wearing a blue sweatshirt with a rounded collar, and dirty white tennis shoes. She identified Diggs as her assailant at trial.

*Assigned by the Chairperson of the Judicial Council.

Several witnesses testified that they had seen Diggs in the bar that night and that he had left sometime after 11:30. A waitress at Neptune's Table testified that she left work around 11:30 on the night in question and stood under a bright streetlight outside waiting for her husband to pick her up. She had been standing there for about 15 minutes when appellant passed her, walking toward the bar, looking angry and upset. Ten or fifteen minutes later, she saw him again on the wharf, this time walking quickly and then breaking into a run.

Diggs offered an alibi defense, claiming that he left Neptune's Table at 10:45 and denying that he attacked Susan. The defense was based on the testimony of several witnesses, including Diggs, his girl friend Cassie Reed, their friend Samantha Ryan, the bartender at Angelo's, another local bar, and two customers at Neptune's Table with whom Diggs had been conversing. The defense version of the evening's events went something like this: Diggs left Neptune's Table at 10:45 to meet Reed at Angelo's. He arrived there sometime before 11 and left shortly thereafter in the company of Reed. He and Reed went for a short walk on the wharf, then drove in Reed's car to Flora's, another bar, where they were to meet Ryan. Instead of going inside, however, Diggs and Reed remained in the car, talking for about half an hour. Finally, around midnight, Diggs asked Reed to take him back to the wharf. She did so. When she returned to Flora's and met Ryan at approximately 12:10, she mentioned that she had just dropped him off.

Diggs walked a short distance up the beach and went to sleep in a grove of eucalyptus trees. He decided not to return to his motel in Seaside (although when first arrested he told police that was what he'd done) because he had to be at work on a fishing boat docked in Monterey in a few hours.

Defense witnesses testified that they had never known Diggs to wear tennis shoes. Diggs and Reed testified that he was wearing boots that night. Reed stated that Diggs smelled strongly of fish much of the time and that he does not wear aftershave or similar preparations. Susan had mentioned that her assailant smelled of something "sweet," and denied that he smelled of fish.

Early in the morning on the last day of trial, Diggs' jury retired to deliberate. At the end of the day, the jury members returned to inform the court that they were unable to reach a verdict.

Prior to the evidentiary phase of the second trial, defense counsel moved to suppress the victim's identification testimony on the ground that it was inherently unreliable and that introduction would violate his right to confrontation and cross-examination because the victim had undergone hypnotic memory enhancement three times in the intervening weeks. Defense counsel also moved for a continuance in order to subpoena experts on the subject of hypnotism and for the court to appoint additional experts pursuant to Evidence Code section 730. The motions were denied.

*Issues Cognizable on Appeal*

1. *Objections to admission of evidence.*

In submitting the case on the transcripts, defense counsel stated: "MR. WORTHINGTON: Your Honor, there's a proposed disposition of this case.... [Defendant] would offer to submit on the transcripts, all of the transcripts, the former trial, which you have, and the preliminary examination which you have, and the testimony that you heard yesterday, and we are stipulating that there's sufficient evidence in those transcripts for a finding of guilt, but it is not a plea of guilty. And the purpose for that is to preserve the issue on appeal regarding the hypnosis."

Later, after the court had advised appellant of his rights pursuant to the *Boykin-Tahl* line of cases,[1] secured a waiver, and found him guilty as charged in count two, defense counsel and the court had the following colloquy: "MR WORTHINGTON: You know, just to be sure the record is absolutely clear, I guess I didn't specify that the four—three motions that were made at the last trial—did I do that yet?—were also adopted, we intended to adopt them.

"THE COURT: Well, they would be part of that trial transcript.

"MR. WORTHINGTON: They'd be part of it by putting that in, but just so the record's clear.

"THE COURT: Everything done at that time will be considered as having been presented.

[1] *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449], cert. den. 398 U.S. 911 [26 L.Ed.2d 72, 90 S.Ct. 1708]; *Boykin v. Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709].

"MR. WORTHINGTON: That was on the pretrial identification procedures, were those motions.

"THE COURT: Surely."

■ The district attorney made no objection at the time, but the People now argue that all issues other than the one challenging the posthypnosis testimony were waived by defendant's failure to reserve them earlier in the proceedings.

Although the principle that waiver or failure to object to the admission of evidence at trial precludes consideration on appeal applies with equal force where the issue of guilt is submitted on the transcripts (*People* v. *Andrews* (1965) 234 Cal.App.2d 69, 77 [44 Cal.Rptr. 94]; *People* v. *Atkins* (1970) 10 Cal.App.3d 1042, 1049-1050 [89 Cal.Rptr. 588]; see *People* v. *Gamble* (1970) 8 Cal.App.3d 142, 149 [87 Cal.Rptr. 333]), the trial court here was fully apprised of Diggs' intent to reserve all of his objections and it agreed to take the case under submission on that basis. (Contrast *People* v. *Griffin* (1967) 250 Cal.App.2d 545, 549 [58 Cal.Rptr. 707].) The People had no quarrel with the understanding reached by the court and cannot complain for the first time on appeal.

2. *Denial of right to counsel at postindictment lineup.*

■ The People admit that Diggs was denied a Sixth Amendment right when the postarraignment corporeal lineup was conducted in his counsel's absence. (*Moore* v. *Illinois* (1977) 434 U.S. 220 [54 L.Ed.2d 424, 98 S.Ct. 458]; *Kirby* v. *Illinois* (1972) 406 U.S. 682 [32 L.Ed.2d 411, 92 S.Ct. 1877].) Given this concession, we must view the trial court's failure to suppress evidence of the lineup and the in-court identification as errors of constitutional magnitude. The court did not conduct an inquiry, out of the jury's presence, with the burden on the prosecution to prove the independent source or origin of the identification testimony, as required by *United States* v. *Wade* (1967) 388 U.S. 218, 241-242 [18 L.Ed.2d 1149, 1165-1166, 87 S.Ct. 1926]; *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]; and *People* v. *Caruso* (1968) 68 Cal.2d 183, 189-190 [65 Cal.Rptr. 336, 436 P.2d 336]. Nor did it make a finding on that point. ■ Both items of evidence must therefore be disregarded by this court in determining whether "beyond a reasonable doubt... the error complained of did not contribute to the verdict obtained." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.

3d 1065]; see *People* v. *Keim* (1970) 8 Cal.App.3d 776, at p. 781 [87 Cal.Rptr. 597]; *People* v. *Martin* (1970) 2 Cal.3d 822, 832-833 [87 Cal.Rptr. 709, 471 P.2d 29].)[2]

Contrary to respondent's argument, defense counsel's stipulation that the record on which he submitted the case contained sufficient evidence to convict is irrelevant in this regard. A concession that a certain quantum of evidence has been introduced by the prosecution is not a concession that the evidence was introduced properly. On the contrary, as discussed above, counsel for the defense expressly reserved his constitutional objection to the lineup for review by this court.

■ Thus, once the lineup and in-court victim identification are deducted from the evidentiary equation, the remainder consists of a basic conflict in the testimony of several other witnesses over where Diggs was, when, and with whom on the night in question. Given the fact that even with the benefit of the victim's full testimony the jury in the first trial was unable to reach a verdict, it does not seem possible that the *Wade-Gilbert* error was harmless beyond a reasonable doubt. Accordingly, we must reverse on this basis. (*Chapman* v. *United States* (1961) 365 U.S. 610 [5 L.Ed.2d 828, 81 S.Ct. 776].) Since appellant may be retried on this charge, however, we pause to consider his remaining contentions.

■ Appellant argues that the trial court erred in refusing to exclude the victim's anticipated testimony from the second trial, that the testimony was inherently unreliable and that permitting her to testify would deprive him of the opportunity to confront and cross-examine the prehypnosis complaining witness, as though she were a different person. We cannot agree with either of these arguments.

Prior to the evidentiary phase of the second trial, the court held an extended hearing on the admissibility of the victim's testimony. When called to the stand, the victim was able to recount the circumstances of the attack with significantly more confidence than she had had at trial. She was able to recall seeing the assailant in the bathroom mirror, bending over her, something that she had not remembered before she

[2]Respondent suggests that this court examine whether the trial court would have admitted the in-court testimony if it *had* undertaken the required inquiry. For this court to make that determination, however, would be to usurp the trial court's function as the trier of fact. The determination is to be made on retrial. (See *Gilbert, supra*, 388 U.S. at pp. 272-273 [18 L.Ed.2d at p. 1186]; contrast *Caruso, supra*, 68 Cal.2d at p. 189, fn. 2.)

underwent hypnosis. From that vantage point she was able to "see" that her assailant's sweatshirt had a hood. Hypnosis seemed to have had the opposite effect on her testimony regarding her assailant's footwear. At trial she was almost certain that he was wearing "very dirty" white tennis shoes. After hypnosis she was not.

Dr. Walter Wilcox, the psychiatrist who hypnotized Susan, testified that he has been licensed as an M.D. in California since 1961, that he is a board-certified psychiatrist, that he uses hypnosis on 5 to 8 percent of his patients, and that he has used it for the specific purpose of memory enhancement on 25 to 30 occasions. He expressed the opinion that hypnosis can be used effectively and reliably for this purpose and testified in detail as to the technique he used on the victim, emphasizing that he had scrupulously avoided posthypnotic suggestion. The tapes and transcript of the interview were introduced into evidence.

The defense called Dr. Bernard Diamond, a recognized expert on psychiatry and the law, who testified in substance that, in his opinion, hypnotically enhanced testimony is inherently unreliable, that hypnosis alters memory and creates a false aura of confidence about recalled perceptions which renders a witness more resilient under cross-examination. Diamond's opinions were bolstered by the introduction of several corroborating affidavits by other experts in the field.

This case presents an issue not yet decided in California, whether testimony is rendered inadmissible by the fact that the witness was interviewed under hypnosis prior to the trial. The California courts have rejected the introduction of opinions based upon hypnotic analysis (*People v. Busch* (1961) 56 Cal.2d 868, 877 [16 Cal.Rptr. 898, 366 P.2d 314]) and statements made while under hypnosis that are introduced to prove their truth (*People v. Blair* (1979) 25 Cal.3d 640, 665 [159 Cal.Rptr. 818, 602 P.2d 738].) These cases are to be distinguished. Here the issue is whether the victim's trial testimony was so tainted by pretrial hypnosis as to render it inadmissible. (See *People v. Smrekar* (1979) 68 Ill.App.3d 379 [385 N.E.2d 848, 853]; *State v. Jorgensen* (1971) 8 Ore.App. 1 [492 P.2d 312, 315 and fn. 1.])

In view of the modification in memory and demeanor which generally follow treatment by hypnosis, we are persuaded that posthypnotic testimony may in many instances properly be termed a product of the technique. The admissibility of evidence based upon a new scientific

technique is governed by *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal. Rptr. 144, 549 P.2d 1240]. Under *Kelly*, the proponent of such evidence must establish (1) the reliability of the method, usually by expert testimony, (2) that the witness furnishing such testimony is properly qualified as an expert to give an opinion on the subject, and (3) that correct scientific procedures were used in the particular case. (*People* v. *Kelly, supra*, 17 Cal.3d 24, at p. 30.)

The *Kelly* court was concerned with and sought to mitigate the dangerous tendency of lay jurors to give considerable and often undue weight to scientific evidence presented by experts with impressive credentials. (17 Cal.3d, at p. 31.) Such procedures are invested with a "'misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.'" (17 Cal.3d, at p. 32.) This is certainly true of hypnosis. While people are generally aware that hypnotic subjects can be made to do irrational things by posthypnotic suggestion, they may also be tempted to see the process as something of a "truth serum," akin to polygraph tests, which have long been ruled inadmissible. (*People* v. *Carter* (1957) 48 Cal.2d 737 [312 P.2d 665]; *People* v. *Adams* (1975) 53 Cal.App.3d 109 [125 Cal.Rptr. 518].)

However, Dr. Diamond's testimony to the contrary, it seems that the lower court here was presented with sufficient evidence of the reliability of the method used, Dr. Wilcox' competence as the technician administering the treatment, the correctness of his procedures, and the relative absence of posthypnotic suggestion. Thus there was adequate showing to establish the admissibility of Susan's posthypnotic testimony under *Kelly* and failure to exclude it was not error.

We have reviewed appellant's remaining contentions and find them devoid of merit.

The judgment is reversed.

White, P. J., and Scott, J., concurred.