[No. B050275. Second Dist., Div. Seven. June 17, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
JERAMIAN PRESTON PARNELL, Defendant and Appellant.

**COUNSEL**

David D. Carico, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Peggy S. Ruffra and Paul C. Ament, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—Defendant, Jeramian Preston Parnell, was convicted by jury of felony murder and attempted robbery and sentenced to life imprisonment without possibility of parole. His appeal challenges his convictions

and the restitution order made part of his sentence. We affirm the convictions and remand the matter to the trial court for a redetermination as to restitution.

### FACTS AND PROCEEDINGS BELOW

Defendant entered a restaurant, sat at the counter and ordered a cup of coffee. After being served defendant got up and went over to the cashier, Glenn Willis. One of the waitresses saw defendant open his jacket, pull a gun from his waist and point it at Mr. Willis's stomach. She heard defendant say to Mr. Willis, "I am going to shoot you. Give me the money and put it in the bag." Another waitress heard defendant say, "Give me the money and get a bag." While Mr. Willis was kneeling down behind the counter where the bags for food to go were kept defendant shot him in the chest. Defendant then walked from the dining area of the restaurant into the bar. He ran to the front door where he hesitated, turned around and pointed a gun toward the bar. After standing there a few seconds he fled out the door.

Several witnesses commented that defendant appeared to be under the influence of drugs. His eyes were red, glassy and wide open. His movements would alternate between slow, quick and jerky. One witness described defendant as appearing dazed, confused and disoriented. Another testified defendant stumbled several times going from the dining area to the door in the bar and that he bumped into the arch of the door.

A month later, police officers on patrol noticed defendant commit a couple of minor traffic violations. They decided to pull defendant over and issue a citation. When the officers activated their overhead lights they observed the passenger in defendant's car throw a gun out the car window. Defendant and the passenger were arrested and the gun retrieved.

Defendant was subsequently charged with attempted robbery and the murder of Mr. Willis. The gun thrown from the window of defendant's car was determined to be the murder weapon and was introduced into evidence over defendant's objection it was unlawfully seized.

The defense virtually conceded defendant was the person who shot Mr. Willis. But the defense vigorously argued defendant was not attempting to rob Willis of the restaurant's receipts. Rather, defendant was having a "flashback" to his war experiences in Vietnam and, under the influence of this hallucination, believed Mr. Willis was a Viet Cong soldier cutting off his route to safety. Under this mistaken belief, defendant shot Mr. Willis in self-defense.

A psychotherapist, Roger Melton, testified for the defense on the flash-back theory. Melton was an expert on posttraumatic stress disorder (PTSD). According to Melton, PTSD can be brought on by a psychologically distressing event outside the range of usual human experience. Vietnam veterans are known to suffer from this disorder. Melton testified one of the symptoms of PTSD is a re-experiencing of the traumatic event—a "flashback." The most common kind of flashback is an anxiety reaction which produces a flight response. If flight is not an option the individual experiencing the flashback will fight whoever is threatening him.

Melton reviewed defendant's military, criminal and mental health records and interviewed defendant on three occasions for about three hours. He also viewed nine videotapes of statements defendant made to another therapist while under hypnosis. Following a ruling by the trial court that Melton could not express an opinion as to defendant's mental state if the opinion was based on statements made under hypnosis, Melton told the jury that, in his opinion, defendant suffers from PTSD but that he could not form an opinion as to whether or not defendant was suffering from a hallucinating flashback at the time of the crimes.

In rebuttal to Melton's testimony, the prosecution introduced the testimony of Dr. Spencer Eth, a psychiatrist who also worked with veterans suffering from PTSD. Dr. Eth had neither interviewed defendant nor examined all the materials Melton examined. Nevertheless, based on the documents he did examine and after reading Melton's reports, Dr. Eth concluded there was insufficient support for a diagnosis of PTSD in defendant's case. Dr. Eth also testified that while it is true a person suffering from PTSD may have flashbacks, only about 15 percent of combat veterans suffer from PTSD and less than a quarter of these ever experience flashbacks. Rarer still are disassociated flashbacks in which the individual loses touch with current reality as the defense contends happened in the present case.

The jury found defendant guilty of attempted second degree robbery and murder. The jury also found as a special circumstance the murder was committed while the defendant was engaged in the attempted robbery. (Pen. Code, § 190.2, subd. (a)(17).) Defendant was sentenced to life imprisonment without possibility of parole on the murder conviction and the upper base term of three years for the attempted robbery. Defendant was further ordered to pay an unspecified amount of money in direct restitution to the victim's widow from his prison wages. (Pen. Code, §§ 2085.5, 6227-6228.)

DISCUSSION

I. *The Trial Court Properly Excluded the Opinion of a Psychotherapist as to Defendant's Mental State at the Time of the Crimes Where the Opinion Was Based in Significant Part on Statements Defendant Made While Under Hypnosis.*

Defendant proposed to introduce the testimony of Roger Melton, holder of a master's degree in clinical psychology and an expert in the field of PTSD. Melton would offer two opinions as to defendant's mental state: (1) that defendant suffers from PTSD and (2) that at the time of the crimes, defendant was suffering from hallucinations induced by PTSD. Defense counsel intended to use these opinions together with other evidence to suggest that while defendant was in the restaurant something triggered a flashback to his Vietnam experience causing defendant to believe he was in Vietnam and the victim was actually a Viet Cong soldier.

Defense counsel advised the court Melton's opinions were based in significant part on videotapes Melton had seen of statements made by defendant to another psychotherapist while defendant was under hypnosis. The court conducted a hearing under Evidence Code section 402 to determine the admissibility of this evidence. After hearing testimony from Melton and argument from counsel, the court ruled Melton could testify about PTSD and its effects but could not express any opinion about defendant's mental state based on defendant's hypnotized statements. The court also ruled defendant could testify about his Vietnam experiences and his dreams about those experiences regardless of whether they were included in his statements under hypnosis and, in expressing an opinion about defendant's mental state, Melton could rely on the testimony given by defendant at trial.

Defendant took the stand and testified about an incident that occurred in Vietnam which continued to trouble him and about dreams he had related to that incident. Melton testified about PTSD and its effects. He testified that in his opinion defendant suffered from PTSD but he could not form an opinion as to whether defendant was suffering from a hallucinating flashback in the restaurant at the time of the crimes.

On appeal, defendant claims the trial court erred in refusing to allow Melton to express his opinion as to defendant's mental state at the time of the crimes based on statements defendant had made under hypnosis. For the reasons explained below, the trial court ruled correctly.

■ Under Evidence Code section 801, the opinion testimony of an expert may be based on matter personally perceived by or known to the

expert and matter "made known" to the expert. "Matter," as used in Evidence Code section 801 encompasses facts, data and intangibles such as the expert's knowledge and experience. An expert's opinion may be based on matter that is not admissible as evidence. (Evid. Code, § 801, subd. (b); *In re Fields* (1990) 51 Cal.3d 1063, 1070 [275 Cal.Rptr. 384, 800 P.2d 862].) However, an opinion is not admissible if it is based in whole or significant part on matter that (1) is not the type of matter that "reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates" or (2) "is precluded by law [from serving] as a basis for his opinion." (Evid. Code, § 801, subd. (b).)

The determination whether matter is of the kind that reasonably may be relied upon by an expert depends on the facts of the case including the matter's reliability. (*In re Mark C.* (1992) 7 Cal.App.4th 433, 444-445 [8 Cal.Rptr.2d 856].) When the expert's opinion is based on tests or techniques which themselves are subject to *Kelly-Frye* analysis, the *Kelly-Frye* criteria must be met before the expert's opinion is admissible. (*People* v. *Bledsoe* (1984) 36 Cal.3d 236, 251 [203 Cal.Rptr. 450, 681 P.2d 291]; *People* v. *Bowker* (1988) 203 Cal.App.3d 385, 390-391 [249 Cal.Rptr. 886].)

■ The issue in this case is whether a patient's statements made while under hypnosis reasonably may be relied upon by a psychotherapist in forming an opinion about the patient's past mental state.[1] We find *People* v. *Busch* (1961) 56 Cal.2d 868, 878 [16 Cal.Rptr. 898, 366 P.2d 314], to be controlling authority on this question. In *Busch*, a defense physician offered to give his opinion of the defendant's mental state at the time of the crimes based on his examinations of the defendant while the defendant was under hypnosis. The doctor testified he had been practicing medicine for eight years, he was not a psychiatrist and that he commenced to specialize in hypnosis on a full-time basis less than a year prior to his appearance as a witness in this case. The trial court ruled the witness could testify as a medical doctor on the defendant's mental condition but could not offer an opinion about the defendant's mental state at the time of the crimes that was based on the results of sessions with the defendant while he was under hypnosis. ■ In affirming the trial court's ruling, our Supreme Court stated: "In laying a foundation for the introduction of opinion evidence of the state of mind of a defendant based upon the use of a technique not theretofore recognized by the courts as sufficiently reliable to form the basis for such an opinion, at the very least, some showing of its successful use in the examination of others than the defendant for the same purpose, either by the witness or by other experts in the field, would appear to be required. We

---

[1]We include in our use of the word "statement" nonverbal conduct intended by a person as a substitute for oral or written verbal expression. (Evid. Code, § 225, subd. (b).)

are persuaded that under the circumstances herein narrated the trial judge did not act unreasonably in his determination that a proper foundation was not established as to the reliability of an analytical tool still seeking recognition in the field of psychiatry, or as to the qualifications of this particular witness to give an opinion on the state of mind of the accused on the occasion of the commission of the homicides herein."

 In the present case no showing was made that statements by a patient under hypnosis have been used by Melton or other experts in the field of PTSD to determine the patient's mental state at the time the patient committed a crime. Nor was there any showing Melton was familiar with hypnosis and its use in psychotherapy. On the contrary, Melton admitted he was totally unfamiliar with the subject of hypnosis.[2] We conclude, therefore, the court properly excluded from evidence an opinion by Melton as to whether defendant was suffering a PTSD-induced flashback at the time of the crime because such opinion was based in significant part on statements made by defendant while under hypnosis.

Defendant contends *Busch* is not controlling because the Supreme Court has subsequently accepted hypnosis as a reliable basis for expert opinion on a defendant's past mental state. He relies on *People* v. *Modesto* (1963) 59 Cal.2d 722 [31 Cal.Rptr. 225, 382 P.2d 33]; *People* v. *Blair* (1979) 25 Cal.3d 640 [159 Cal.Rptr. 818, 602 P.2d 738]; and *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 723 P.2d 1354]. We disagree with defendant's interpretation of these cases. Furthermore, even if defendant's interpretation is correct the problem remains his expert, Melton, had no knowledge or experience that would allow him to use hypnotically induced statements as a diagnostic tool in arriving at an opinion defendant was suffering from PTSD when he committed the crimes involved in this case.

In *People* v. *Modesto, supra*, the trial court allowed a defense psychiatrist to give an opinion of the defendant's mental state at the time of the crimes based on examinations of defendant that included hypnosis. The trial court refused, however, to allow the expert to give the jury an explanation of hypnotic techniques as they are used in a psychiatric examination as a basis for her expert opinion. The Supreme Court held, "It was error . . . to exclude Dr. Zonnis' proffered explanation of hypnotic techniques as they are used in a psychiatric examination as a basis for expert opinion. The evidence

---

[2]Defendant offered to produce testimony from the forensic hypnotist who questioned defendant about his experiences in Vietnam and his dreams while defendant was under hypnosis. This offer was properly rejected because it would have proved, at most, defendant was under hypnosis when he made certain statements. It would not have laid the foundation for Melton's opinion under the requirements set out in *Busch, supra*, 56 Cal.2d 868.

was clearly admissible for that purpose." (59 Cal.2d at p. 732.) The court distinguished *Busch* as follows: "In the *Busch* case we held that the trial court did not err in excluding an expert's opinion based in part upon an hypnotic examination on the ground that no proper foundation had been laid to show the reliability of hypnosis as an analytical tool or that the expert was qualified in its use for that purpose. In the present case, however, Dr. Zonnis was qualified as an expert psychiatrist. *The defense offered to prove that hypnosis is an accepted analytical tool in the psychiatric profession in determining a person's state of mind,* and Dr. Zonnis was allowed to state her opinion based in part on the hypnotic examinations. Under these circumstances, there is nothing in the *Busch* case that would preclude introducing in evidence all of the data on which she based her opinion." (*Id.* at p. 733; italics added.)

In *People* v. *Blair, supra,* the court upheld the trial court's ruling excluding a tape recording of statements made by a defense witness while hypnotized. The court cited *Modesto* for the proposition "such statements . . . may be used to establish a basis for expert opinion [but] they are not admissible to prove the truth of the matter therein contained." (25 Cal.3d at p. 665.)

*People* v. *Shirley* is, of course, the leading California case on the use of evidence derived from hypnosis. After a detailed examination of the scientific evidence on the reliability of hypnosis to produce truthful and accurate recollections of events the court concluded hypnosis is not generally accepted as reliable in the relevant scientific community and therefore the testimony of a witness is inadmissible as to all matters that have been the subject of a hypnotic session to restore or improve the witness's memory of the events in question. (31 Cal.3d at p. 68.)

Defendant points out that *Shirley* itself distinguished between statements made under hypnosis introduced to prove the truth of the matter asserted and those "used to establish a basis for expert opinion . . . ." (31 Cal.3d at p. 33.) Defendant also argues *Shirley* concluded hypnosis was an unreliable technique for eliciting truthful *verbal* statements. (*Id.* at pp. 53, 56, 66-67.) In the present case, defendant asserts, Melton was not relying on the truth of defendant's verbal statements while under hypnosis to form his opinion defendant was suffering from PTSD at the time of the crimes. Rather, he was relying on the *way* defendant said things—his "emotionality"—in forming the opinion defendant was suffering from PTSD. Defendant states nothing in the scientific literature relied on in *Shirley* suggests the feelings or "emotionality" expressed by an individual under hypnosis is any more or less real than feelings expressed in a state of normal consciousness.

We do not read *Modesto, Blair* or *Shirley* as holding hypnosis has been established as a reliable technique for determining the mental state of the

defendant at the time of committing the crimes. *Modesto* was the only one of the three cases in which hypnosis was used to determine the defendant's mental state; the comments in *Blair* and *Shirley* are mere obiter dicta. The issue in *Modesto* was *not* whether an opinion about the defendant's mental state could be based on the defendant's statements while under hypnosis. The trial court had permitted the defendant to introduce the opinion of an expert as to his mental state when the crimes were committed based, in part, on statements the defendant made while under hypnosis. (59 Cal.2d at p. 732.) The principal issue in *Modesto* was whether, having allowed the expert to express her opinion, the court should have allowed her to explain the hypnotic techniques she used as a basis for her opinion. The court's holding was that having permitted the expert to express her opinion, it was error not to allow her to explain the basis for it to the jury. (*Ibid.*)

In *People* v. *Kelly* (1976) 17 Cal.3d 24, 32 [130 Cal.Rptr. 144, 549 P.2d 1240], the court stated: "[O]nce a trial court has admitted evidence based upon a new scientific technique, and that decision is affirmed on appeal by a published appellate decision, the precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community." ■ It is true the trial court in *Modesto* admitted evidence based on hypnosis. However, the propriety of that decision was not affirmed on appeal because it was never raised on appeal. It is well settled a case is not authority for an issue not decided. (*People* v. *Young* (1987) 189 Cal.App.3d 891, 914 [234 Cal.Rptr. 819].) Thus, *Modesto* cannot serve as precedent for the admissibility of expert opinions about defendants' mental states based on statements by the defendants under hypnosis.

It is worth noting at this point we have found no published appellate decision from *any* jurisdiction holding an expert may reasonably rely on the defendant's statements under hypnosis in determining the defendant's mental state at the time of the crimes. Instead, the reported decisions are unanimously to the contrary. (*People* v. *Diaz* (Colo.Ct.App. 1982) 644 P.2d 71, 73 [citing cases]; *Jones* v. *State* (Okla.Crim.App. 1975) 542 P.2d 1316, 1328; *Rodriguez* v. *State* (Fla.Dist.Ct.App. 1976) 327 So.2d 903, 904.)

*Modesto* is also distinguishable from the present case because the expert witness in *Modesto* was an expert in hypnosis and had personally conducted the hypnotic sessions with the defendant. (59 Cal.2d at pp. 732-733.) Here, Melton admitted he knew nothing about hypnosis and was relying solely on the videotapes of hypnotic sessions conducted by another. Thus, even if an expert could base an opinion as to the defendant's mental state on information gained through hypnosis, Melton did not qualify as such an expert. (*People* v. *Busch, supra,* 56 Cal.2d at p. 878.)

Finally, defendant's attempt to distinguish *People* v. *Shirley* on the ground it involved verbal as opposed to nonverbal statements is not persuasive. The court in *Shirley* made no such distinction in analyzing the reliability of hypnosis as a scientific technique. Even if it had made such a distinction, defendant would still have had the burden of establishing hypnosis can reasonably be relied upon in forming an opinion about a defendant's mental state at the time of a crime. Furthermore, it is unclear from the record just what aspect of defendant's hypnotic sessions Melton was relying on. At one point, as defendant asserts, Melton appears to be relying on "the emotionality that [defendant] presented when he was talking during the videos, when he was describing the events." At another point, it appears Melton is relying on the defendant's verbal as well as nonverbal statements in forming his opinion. At still another point during the Evidence Code section 402 hearing Melton appears to have withdrawn altogether his opinion defendant was suffering from PTSD at the time of the crimes because he decided he could not rely on the hypnotic sessions as supplying reliable information on which to form an opinion.

## II. *The Trial Court Correctly Instructed the Jury as to First And Second Degree Murder. Any Error in Failing to Instruct on Voluntary and Involuntary Manslaughter Was Harmless.*

The trial court instructed the jury as to first degree murder under the felony-murder rule, special circumstance felony-murder and second degree murder. The court refused to instruct the jury on voluntary or involuntary manslaughter. Following these instructions, in a "comment on the evidence," the court suggested to the jurors they should decide the robbery charge first. The court told the jury if it found defendant not guilty of attempted robbery then it could not find him guilty of first degree murder and would have to decide if he was guilty of second degree murder or not guilty at all. On the other hand, "If you find the defendant guilty of [attempted robbery] and if you find that he killed Mr. Willis during the commission of an attempt to commit a robbery . . . then the subject of post-traumatic stress and resulting flashback should play no part in deciding [the murder charge]."

Defendant asserts the trial court erred in instructing the jury, in effect, if it found defendant was able to form the intent necessary to commit the crime of attempted robbery then it could ignore his "flashback" defense as to the murder charge. The error, according to defendant, is that defendant might have suffered the "flashback" in the course of the attempted robbery. In other words, defendant might have formed the intent to commit the robbery and then, when Mr. Willis bent below the counter, gone into a "flashback" and shot Willis believing him to be a Viet Cong hiding in the bushes.

There is a noticeable lack of any evidence to support defendant's hypothetical example. But even if events were exactly as posited by defendant, he would still be guilty of felony murder. Under the felony-murder rule, defendant is strictly liable for his killing of Mr. Willis committed in the attempt to perpetrate a robbery and this is true whether the killing was unintentional, accidental or wholly unforeseeable. (Pen. Code, § 189; *People* v. *Dillon* (1983) 34 Cal.3d 441, 477 [194 Cal.Rptr. 390, 668 P.2d 697]; *People* v. *Caldwell* (1980) 102 Cal.App.3d 461, 478 [162 Cal.Rptr. 397].) The same is true as to the felony-murder special circumstance. (Pen. Code, § 190.2, subd. (a) (17); *People* v. *Jennings* (1988) 46 Cal.3d 963, 979 [251 Cal.Rptr. 278, 760 P.2d 475].)

■ Defendant also posits numerous scenarios in which the jury could have found him not guilty of attempted robbery but guilty of something less than second degree murder, i.e., voluntary or involuntary manslaughter. The difficulty with this argument is the jury *did* find defendant guilty of attempted robbery and *did* find defendant killed Mr. Willis in the perpetration of attempted robbery. Thus, even if the trial court erred in failing to instruct as to voluntary and involuntary manslaughter, the error was harmless because "the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)

III. *The Police Properly Seized the Gun Thrown From Defendant's Vehicle.*

Defendant claims the trial court should have granted his motion to suppress evidence of the gun thrown from his car because the traffic stop was merely a pretext to search for evidence of other crimes. The facts do not support defendant's claim.

■ As was noted in *People* v. *Franklin* (1985) 171 Cal.App.3d 627, 633 [217 Cal.Rptr. 529], "While a traffic stop or arrest may not be used solely for the purpose of discovering evidence of another charge (i.e., to effect a so-called pretext search) . . . it is recognized that a police officer is not barred from investigating an unrelated offense if the circumstances give rise to probable cause that the traffic violator is or has been involved in the commission of another crime." (Citations omitted.) In the present case, the evidence showed that prior to being stopped defendant committed two traffic violations in the officers' presence: an unsafe lane change and turning without signaling. Upon the second violation the officers activated their overhead lights signaling defendant to pull over. Immediately thereafter, and in plain view of the officers, the passenger in defendant's car threw a gun

out the window. Clearly, the officers had probable cause to issue defendant a traffic citation at the time they signaled him to pull over. It would defy common sense to hold seizure of the gun under these circumstances was unreasonable.

Defendant's argument is based on the fact the officers were not on traffic detail but were part of a gang surveillance unit. He infers from this the officers had some hidden agenda in stopping his car. It is true the trial court commented it did not believe the traffic violations were the "only" reason the officers stopped defendant's car. However, if the officers had a "hidden agenda" it does not appear from the evidence. There was no evidence, for example, the officers suspected defendant of any crime (other than traffic violations) or that they suspected defendant was involved in any gang activity. Perhaps the officers believed in stopping defendant for the traffic violations they might "get lucky" and uncover evidence of a crime. However, numerous courts have held a traffic stop "which is reasonable based on the objective facts is not made unreasonable by the officer's subjective hope the stop might yield evidence of other crimes." (*People* v. *Uribe* (1993) 12 Cal.App.4th 1432, 1438 [16 Cal.Rptr.2d 127], citations omitted.) As stated in *Uribe*, "[A] search or seizure which is reasonable based on the objective facts is not rendered unreasonable merely because the officer held an improper subjective motivation at the time of the search." (*Id.* at p. 1436, fn. omitted.)

The case relied on by defendant, *People* v. *Aguilar* (1991) 228 Cal.App.3d 1049 [279 Cal. Rptr 246], is distinguishable. In *Aguilar* the arresting officer believed there was stolen property in the trunk of the defendant's car. He decided to follow the defendant until the defendant committed some traffic offense which would give him an excuse to stop the defendant. Eventually, the defendant failed to make a proper stop at an intersection and made a turn without signaling. The officer used these traffic violations as a reason to stop the defendant's car. The officer then discovered the defendant was driving with a suspended license. The officer took the defendant into custody and ordered the defendant's car impounded. The officer knew that by impounding the car he would be able to search it. In fact, the officer admitted the *only* reason he ordered the car impounded was so that he could search the trunk. (*Id.* at pp. 1051, 1053.) The court held the evidence found in the trunk should have been suppressed, *not* because the traffic stop itself lacked probable cause, but because the impound was merely a ruse to get around the

lack of probable cause to search the trunk. The officer had no other basis for impounding the car. (*Id.* at p. 1053.) Nothing in *Aguilar* suggests that if the stolen property had been sitting in plain sight on the seat next to the defendant the officer would have been prevented from seizing it because of his elaborate plan for seizing it from the trunk.

IV. *The Court Erred in Failing to Conduct a Hearing on the Amount of Restitution to Be Paid to the Victim's Widow and in Ordering Restitution to Be Paid Pursuant to Penal Code Sections 6227 and 6228.*

At the time of sentencing, the trial court ordered defendant to make restitution to the victim's widow "to the extent permitted by law" for her out-of-pocket expenses relating to the victim's medical treatment and funeral. The court further ordered this restitution be paid "pursuant to [sections] 6227 and 6228 of the Penal Code."

Defendant contends, and the People agree, the trial court erred in failing to determine the amount of restitution after a hearing. (Gov. Code, § 13967, subd. (c); *People* v. *Cotter* (1992) 6 Cal.App.4th 1671, 1674 [8 Cal.Rptr.2d 606].) Government Code section 13967, subdivision (c) provides in relevant part: "In cases in which a victim has suffered economic loss as a result of the defendant's criminal conduct, and the defendant is denied probation, . . . the court shall order restitution to be paid to the victim. . . . The court shall order full restitution unless it finds clear and compelling reasons for not doing so and states them on the record. A restitution order imposed pursuant to this subdivision shall identify the losses to which it pertains, and shall be enforceable as a civil judgment. [¶] For any order of restitution made pursuant to this subdivision, the defendant shall have the right to a hearing before the judge to dispute the determination made regarding the amount of restitution."

Furthermore, Penal Code sections 6227 and 6228 relating to placement in restitution centers are not applicable to this defendant because he was sentenced to life imprisonment without possibility of parole.

For these reasons we must remand the matter to the trial court for a proper determination as to restitution to Mr. Willis's widow.

DISPOSITION

We reverse that portion of the judgment which orders payment of restitution to the victim's widow and remand the matter to the trial court for further

proceedings in accordance with Government Code section 13967, subdivision (c). In all other respects the judgment is affirmed.

Lillie, P. J., and Woods (Fred), J., concurred.

A petition for a rehearing was denied July 19, 1993, and appellant's petition for review by the Supreme Court was denied September 23, 1993.